**Steven Mark LASAR, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. CV 99–177–M–WNM.**

United States District Court,
D. Montana,
Missoula Division.

Jan. 2, 2003.

---

Michael D. Weisman, Weisman & Associates, Boston, MA, Paul C. Meismer, Caarey Meismer, Missoula, MT, Patrick M. Ardis, Wolff Ardis, Memphis, TN, for Plaintiff.

John D. Stephenson, Jardine, Stephenson, Blewett & Weaver, Great Falls, MT, Lawrence A. Sutter, Sutter, O'Connell, Mannion & Farchione, Cleveland, OH, for Defendant.

## ORDER

MOLLOY, Chief Judge.

### I. Factual Background

This case arises out of an accident on February 17, 1997 in which Plaintiff Ste-

ven Lasar was injured when the 1986 Ford Ranger pickup he was driving rolled several times. Lasar was ejected from the vehicle, suffering severe injuries. He filed suit against Ford Motor Company alleging, in part, that the door latch mechanism on the Ranger was defective, allowing the door to open during the accident and leading to his ejection from the vehicle.[1]

The case was referred to United States Magistrate Leif B. Erickson for all pretrial proceedings. In response to motions in limine, Judge Erickson ruled that under Montana law, evidence of Lasar's failure to wear a seatbelt was inadmissible at trial.[2] Judge Erickson also ruled that any evidence of alcohol use by Lasar on the day of the accident would be excluded at trial. On the alcohol issue, Judge Erickson found, and Ford has conceded, that there is no evidence to establish a causal link between Lasar's modest consumption of alcohol and the accident.[3] Ford objected to Judge Erickson's rulings, even though Montana law is clear on seatbelt evidence and even though Ford had no relevant proof to support its prejudicial argument that drinking was involved in the wreck.

After further briefing, I overruled both objections and affirmed by written order there would be no evidence or inference at trial about seatbelts or alcohol.

The case was originally set for trial on February 4, 2002. At that time, Ford was represented by John Stephenson and John Randolph Bibb, the latter having been admitted pro hac vice. Due to other cases on the docket, the February trial date was continued until May 6, 2002. On April 24, 2002, Ford moved to allow Bibb to withdraw and to substitute Lawrence Sutter as counsel.[4] I allowed Bibb to withdraw and, based on the representations in his affidavit, granted Sutter's admission pro hac vice. As it turns out, that affidavit was misleading and failed to inform the Court of Sutter's prior contempt in an Ohio state court. (*See* Ohio Aff. of Lawrence A. Sutter, attached as Appendix A.)[5]

In late April 2002, it became apparent that a number of criminal matters would be going to trial at the same time that this case had been set. The Court was again compelled to continue Lasar's case. Trial was rescheduled for October 7, 2002. Be-

---

**1.** Lasar brought several claims, however, all but his strict liability claim were dismissed upon his own motion.

**2.** Mont.Code Ann. § 61–13–1–6 states

[e]vidence of compliance or failure to comply with 61–13–103 is not admissible in any civil action for personal injury or property damage resulting from the use or operation of a motor vehicle, and failure to comply with 61–13–103 does not constitute negligence.

**3.** The only evidence of alcohol use was Lasar's statement in a deposition that he drank a few beers over the course of the day. Tests taken after the accident indicated that Lasar had a blood alcohol concentration well below the level at which a driver in Montana is considered to be impaired. Additionally, testimony of his friends, and testimony from a highway patrol officer that stopped him short-

ly before the accident indicate that Lasar was not intoxicated.

**4.** Though the motion to withdraw and substitute was filed in April 2002, Sutter's affidavit in support of his admission pro hac vice was filed May 7, 2002.

**5.** Sutter filed this affidavit with the Ohio court in December of 1999. It is highly improbable that he forgot about having been jailed twice for contempt in the time between December 6, 1999 and May 7, 2002 when he filed his pro hac vice request in this Court. Further, Sutter's pro hac vice affidavit did not state that he had not been held in contempt, but omitted any reference to contempt, though it included all other information required by local rule. *Compare* L.R. 83.3(e)(3), attached as Appendix B, *with* Pro Hac Vice Aff. of Lawrence A. Sutter, attached as Appendix C.

fore trial, I issued my orders overruling Ford's objections to Judge Erickson's rulings.

At trial, during the Court's voir dire, I made it clear to the jury panel that, if selected as jurors, they could not consider Lasar's use or non-use of seatbelts in rendering a verdict. All jurors agreed that they would follow this direction. The issue and the law had been explained to them and I was satisfied the case could be tried within the constraints of Montana law. The issue of alcohol was not discussed at anytime in voir dire or in Plaintiff's opening statement. It was not an issue, or so I thought.

During Defendant's opening statement, Sutter decidedly made the following prejudicial assertions:

Let me give you a few more details.

At about 5:00 that morning, Mr. Lasar got out of bed and went hunting for the morning. Some time in the afternoon, he met up with some of his friends and spent the day playing pool, *visiting some local establishments.* Somewhere around 10:00 that night, *he made the decision to drive himself home. He got into his car and he began his way back to his homestead.*

. . .

Now, inside the vehicle, something else was going on; Lasar was what we call *a free-floating body. His body was banting (sic) about inside the car as it was rolling over.* And because of what happens during the rollover, something all of us learned in high school and most of us tried to forget, centrifugal force. All that is, is something spinning around like a yo-yo on a string; it wants to keep going outward.

Partial Tr. of Sutter's Opening Statement, Docs. 170, 171 (emphasis added).[6]

Immediately following Sutter's opening statement, counsel for Lasar requested a side bar. I denied the request and told counsel that any issues would be dealt with at a later time. Furthermore, the order in limine protected Lasar's record on the violation of the Court's orders. When given an opportunity, counsel for Lasar strenuously objected to Sutter's opening to the extent it implied that Lasar was intoxicated or that he was not wearing a seatbelt at the time of the roll-over. While Lasar initially asked for a curative instruction, it was clear that Sutter's deliberate violation of the Court's orders in limine would prevent a fair trial.

I ultimately granted a motion by Lasar for a mistrial. Given the egregiousness of the violation, I determined an award of sanctions would be appropriate. Ford and Sutter were given notice of my intentions and the remedies and sanctions being considered. On October 10, 2002, a hearing was held at which I addressed three issues: (1) the amount and nature of sanctions to be imposed; (2) whether Sutter could show cause why he should not be held in contempt; and (3) whether Sutter should have his admission to practice pro hac vice revoked.

After considering the evidence presented at the show cause and contempt hearing, I have concluded that Lawrence Sutter and Ford should be sanctioned for Sutter's deliberate violation of the orders in limine. I have concluded that Sutter is in contempt of court for violating the order prohibiting him from suggesting alcohol was an issue when he knew there was no proof to support the prejudicial inference

---

**6.** As I noted at the time I ruled on the mistrial, the cold record cannot capture the tone, the inflection, and the deliberate message Sutter intended, and communicated in his irrelevant and prejudicial statements.

and suggestion, and when he knew the proof from the Highway Patrol, friends, and medical evidence was contrary to what he implied to the jury. Finally, I find that Lawrence Sutter deliberately misled the Court in his application to appear in this case pro hac vice. His deceit was compounded by further misleading statements about his prior contempt in Ohio and his relativist ethics in trying to rationalize his admitted efforts to stay within his perception of the letter of a court order, while blatantly violating the intent and spirit of the order. In short, Lawrence Sutter lacks the candor and integrity to appear in this Court pro hac vice. There is no room in this Court for lawyers who do not abide by the rules of court and the orders entered in a case. My reasoning is set forth below.

## II. Authority for Contempt and Sanctions

The Court's power to impose sanctions on Ford Motor, Sutter or both derives from three places: (1) the Court's inherent authority; (2) 28 U.S.C. § 1927; and (3) Local Rule 83.14(b) & (c). The Court's inherent authority also allows it to hold Sutter in contempt for violating a specific court order. It is within my discretion to determine upon which ground I will rely when imposing sanctions. *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir.2001). In this case, I rely upon my inherent power in resolving the issues before me.

### A. 28 U.S.C. § 1927

Section 1927 allows counsel to be held liable for conduct that "multiplies the proceedings in any case unreasonably and vexatiously." In such a case, the Court may order counsel to pay "excess costs, expenses, and attorneys' fees reasonably incurred" because of the conduct. Liability under this statute is limited to counsel and cannot be imposed on the party. Additionally, the range of sanctions is limited to excess costs and fees and is not as broad as the sanctions allowed under the Court's inherent authority. I am not relying on this statute in the orders I am entering in this case.

### B. Inherent Authority

 Under its inherent authority, the Court, acting on motion or sua sponte, has the power to sanction bad faith conduct, even where that conduct is sanctionable under other rules or statutes. *In re Itel Securities*, 791 F.2d 672 (9th Cir.1986). To impose sanctions, the Court must make a finding in the record that Sutter acted in bad faith or that his conduct was "tantamount to bad faith." *Fink*, 239 F.3d at 994. While recklessness alone is not enough to impose sanctions under the Court's inherent authority, recklessness coupled with an improper purpose justifies sanctions. *Id.* (holding that reckless misstatements of law or fact made in an attempt to influence or manipulate proceedings to gain a tactical advantage are sanctionable). See also, *id.* at 992 (relying on *Itel* and noting that "sanctions are justified when a party acts *for an improper purpose*—even if the act consists of making a truthful statement or non-frivolous argument or objection" (emphasis in original)).

Under its inherent authority, the Court has broad discretion in the types of sanctions imposed, including attorney's fees and costs, disciplining the attorney, giving a warning of default or dismissal, and/or a fine payable to the Court. The purpose of a fee award is to compensate the innocent party, vindicate an affront to the Court, and to ensure abuses are not repeated. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 56–57, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The award of fees is not limited to excess fees, as in § 1927; however, any

sanction imposed must relate to and be appropriate to the bad faith conduct involved. Additionally, unlike sanctions under § 1927, sanctions under the Court's inherent authority can be imposed against the attorney, the client or both. *See Cannon v. Loyola University of Chicago*, 784 F.2d 777, 782 (7th Cir.1986); Rutter Group Practice Guide, Federal Civil Procedure Before Trial, 17:5(a), 17:133. Again, I am relying on my inherent authority in entering the orders in this case that follow.

## C. Local Rules

Local Rule 83.14(b) & (c) allows the Court to sanction an attorney for violating any court order. Possible sanctions include suspension, restitution, and fines or assessment of costs.

## D. Civil Contempt

The Court's inherent authority includes the power to hold a party or an attorney in contempt of court. The contempt power includes the power to impose sanctions, and is intertwined with the powers discussed above.

Civil contempt occurs when there is a clear and definite order, the contemnor knows of the order, and he or she violates the order. *United States v. Powers*, 629 F.2d 619, 627 (9th Cir.1980). Unlike criminal contempt, civil contempt does not require a willful violation and good faith is not a defense. *Id.* Attorneys are bound to obey court orders, even when they believe the orders are clearly erroneous. *Chapman v. Pacific Telephone and Telegraph Co.*, 613 F.2d 193. 197 (9th Cir.1979).

A sanction for contempt is civil if the purpose of the sanction is to coerce compliance or to compensate an innocent party for the contemnor's violation. *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1137–38 (9th Cir.2001). The order imposing civil contempt must contain clear justification for the purpose and amount of any sanctions imposed. *O'Connor v. Midwest Pipe*, 972 F.2d 1204, 1211 (10th Cir.1992). Additionally, the record must reflect consideration of the following factors:

(1) harm from noncompliance;

(2) probable effectiveness of the sanction;

(3) contemnor's financial resources and burden sanctions may impose; and

(4) contemnor's willfulness in disregarding the court's order.

*United States v. United Mine Workers of America*, 330 U.S. 258, 303–304, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

## III. Analysis

### A. Sanctions

[5] In this case, an award of sanctions under my inherent authority and L.R. 83.14(b) & (c) is appropriate. Sutter's conduct has resulted in unnecessary multiplication of proceedings and undue expense to Lasar, his counsel, and the Court. In listening to Sutter's opening statement, it is obvious that it was well-planned and that he chose his words carefully. I believe his deliberate effort to circumvent the two orders in limine was done intentionally and in bad faith. Sutter, without using notes or other cues, referred to trial exhibits as they appeared on the courtroom screens, though he could not see the screens. His presentation was polished and careful; his tone, his pacing, his inflection, and his body language were all observed by the jury and the Court and were obviously intended to leave the jury with the following message: Lasar spent the day drinking, decided to drive himself home, did not wear his seatbelt, then rolled his truck and is now claiming it is Ford's fault! Based on this, the only con-

clusion I can reach is that Sutter intended to poison the jury by intimating that Lasar was drunk at the time of the accident and that he was not wearing a seatbelt. This was a willful and bad faith violation of both the orders in limine of Judge Erickson and of this Court.

In preparing this case for trial on October 7, 2002, Lasar incurred many expenses. The two weeks leading to trial are critical in the time, effort, and expense necessary to prepare. Many costs, including some expert fees, attorneys' fees, travel expenses, and other expenses will be repeated by virtue of Sutter's unprofessional conduct at trial.

Counsel for Lasar, at the Court's direction, submitted affidavits and documentation seeking a total of $193,966.53 in costs as sanctions against Ford and Lawrence Sutter. Both Ford and Sutter had this information before the October 10, 2002 hearing. Based upon the affidavits filed by Lasar, and Ford's counter-arguments, I have determined that Lasar is entitled to an award of sanctions totaling $61,397.50. This amount is assessed jointly and severally against Ford and Lawrence Sutter.[7] Ford shall pay an additional $5,496.15 to the Clerk of Court for the cost of empaneling the jury. A breakdown of the sanctions is set forth below.

### 1. Attorneys' Fees

Lasar asks for attorneys' fees totaling $99,478.43. The submission includes time for five attorneys and six paralegals with attorney time calculated at $250.00 per hour. While Lasar should be awarded fees for the time attorneys Michael Weisman, Paul Meismer, and Pat Ardis spent preparing during the two weeks before trial, no fees are awarded for paralegal or associate time. Weisman, Meismer, and

Ardis were lead counsel and they will need to expend a similar amount of time preparing for a later trial. The two associates and six paralegals were not lead counsel and, had they not been working on this matter, they would have been paid for other work. I am mindful that Lasar has employed the lawyers through a contingent fee.

Lasar bases his fee calculation on a rate of $250 per hour for attorney time. His lawyer has candidly stated that the case is not so complex as to require specialized skill or knowledge. Counsel for Ford indicates that his normal hourly rate is $140.00 per hour, while Meismer indicates that he normally charges $150.00 per hour when performing mediation. Lasar's $250.00 per hour calculation is based in part on the risk associated with taking a contingency fee case. However, the award of fees as sanctions is guaranteed; because the matter is not unusually complex, the lower $150.00 per hour rate is reasonable. Thus, Lasar will be awarded attorneys' fees calculated at $150.00 per hour for the time of Weisman (118.8 hours), Meismer (87.0 hours), and Ardis (57.15 hours). Total attorneys' fees in the amount of $39,442.50 are assessed.

### 2. Costs for Dr. Rudy Limpert, Dr. Martha Bidez and Andrew Gilberg

Lasar seeks reimbursement of expenses totaling $7,271.00 for Dr. Limpert, $18,026.00 for Dr. Bidez, and $12,055.50 for Andrew Gilberg. Each is an expert witness retained by Lasar and each traveled to Missoula in anticipation of testifying at trial. The invoice submitted on behalf of Dr. Limpert indicates expenses of $971.00 and fees of $6,300.00. Dr. Limpert was the only expert to testify before I declared

---

**7.** No sanction is imposed on John Stephenson, Ford's Montana counsel. Nothing in this Order is intended to reflect on the character or professionalism of Mr. Stephenson.

a mistrial. His invoice includes 1 1/4 days of preparation and one day of testimony, which includes travel time. Ford objects to an award of fees for the preparation time. However, this is time Dr. Limpert will again expend in preparing for the next trial. Therefore, the full $6,300.00 in fees is reasonable. Because Ford does not object to the expenses incurred by Dr. Limpert, Lasar is entitled to an award of $7,271.00 for the fees and expenses of Dr. Limpert.

Dr. Martha Bidez also traveled to Missoula, however, she did not testify. Lasar seeks a total of $18,026.00 for Dr. Bidez' services, including $16,000.00 in fees and $2,026.00 in expenses. Ford argues that this amount is unreasonable, as it amounts to five twelve hour days at her stated rate of $250.00 per hour.

The Court agrees with Ford on this issue. Dr. Bidez did not testify, but she was required to travel to Missoula and sit outside the courtroom on the first day of trial. A reasonable expense for purpose of sanctions is eight hours at $250.00 per hour, plus her expenses of $2,026.00, for a total of $4,026.00.

Likewise, Andrew Gilberg traveled to Missoula but did not testify. Lasar seeks a total of $12,055.50 on his behalf, including $9,377.50 in fees and $2,678.00 in expenses. Like Dr. Bidez, a reasonable expense for purpose of sanctions is eight hours at Gilberg's stated rate of $275.00 per hour, plus the $2,678.00 in expenses, for a total of $4,878.00.

### 3. Treating physicians

Lasar asks for reimbursement of fees for the services of Dr. Mark Dietz and Dr. Karen Weed, both of whom are treating physicians. Both were expected to testify, though neither one traveled to Missoula. Lasar submitted a bill on behalf of Dr. Weed indicating a charge of $225.00 for trial preparation. Lasar did not submit a bill on behalf of Dr. Dietz, but Weisman indicated in an affidavit that the services of Dr. Dietz would cost $1,125.00.

Both treating physicians will need to review their records prior to the next trial. The amount requested on behalf of Dr. Weed is reasonable, as it is likely she will incur a similar amount in later preparation for trial testimony. The amount requested for Dr. Dietz is based on counsel's knowledge of the work he did in preparing for the trial. In light of the statement submitted on behalf of Dr. Dietz, the Court finds that a reasonable amount for the treating physicians' cumulative preparation time is $1,350.00.

### 4. Costs for Anne Arrington and Dr. Ronald Dulaney

Ms. Arrington and Dr. Dulaney are experts retained by Lasar who did not testify and did not incur travel expenses. Ford objects to either receiving any payment on this basis. The objection is without merit, as both witnesses had to prepare for trial. Ms. Arrington's invoice indicates ten hours of trial preparation at $85.00 per hour and a testimony cancellation fee equivalent to four hours at $125.00 per hour. Ms. Arrington will spend additional time preparing for the next trial and the cancellation fee is a direct result of Sutter's misconduct. Therefore, ten hours at $85.00 per hour plus the $500.00 cancellation fee is a reasonable fee for Ms. Arrington, and $1,350.00 is included on her behalf in the sanctions award.

Dr. Dulaney's invoice indicates costs of $330.00 to review Lasar's file, $375.00 to update trial exhibits, and a $500.00 scheduling fee, all of which Lasar will incur again when the case goes to trial. Therefore, $1,205.00 is a reasonable fee for Dr.

Dulaney's efforts and is included as part of the sanctions award.

### 5. Litigation Abstracts and Jury Consultants

Lasar requests payment of $4,776.35 for Litigation Abstracts and $1,875.00 for Jury Consultants, Inc. The charges of Litigation Abstracts will not be repeated, as the fruits of those services are useable at the next trial. Contrarily, the work of Jury Consultants, Inc., though optional, will likely be repeated at the next trial.[8] Thus, Lasar is awarded costs of $1,875.00 for Jury Consultants, Inc. and no costs for Litigation Abstracts.

### 6. Other Expenses

Lasar also asks for reimbursement of $10,875.13 for deposition transcripts and $22,748.00 for copying expenses. These costs were not incurred as a result of Sutter's misconduct or the mistrial. The deposition transcripts and photocopies can be used at the next trial. An award of sanctions for these costs would not be reasonable.

### 8. Jury Costs

In addition to the expenses incurred by Lasar, the Court was required to pay to empanel a jury that was not used because of Sutter's wrongdoing. The Court must pay these expenses again, making it an appropriate sanction. Empaneling the jury cost a total of $5,496.15, including $9.00 for parking tickets, $1,615.00 for subsistence, $2,080.00 for attendance fees, and $1,792.15 for mileage. This cost is assessed against Ford alone.

### 9. Conclusion

The purpose of the sanctions imposed is to put the parties where they were two weeks before trial to the extent that is possible. Ford chose Sutter as its attorney and, as a consequence, is equally bound by his bad faith as it is by his success rate. Failure to award sanctions when Ford caused Lasar to lose his "day in court" would force Lasar to reincur many of the costs at a later time, through no fault of his own. The necessary balancing, then, is to determine the amount of sanctions that will fairly compensate Lasar for expenses he would not have incurred but-for Sutter's misconduct, to vindicate Sutter's bad faith affront to the authority of the Court, and to ensure such abuses are not repeated, all while refraining from unnecessarily punishing Ford or Sutter.

Based on the analysis above, sanctions in the amount of $66,893.65 are reasonable. Of these sanctions, $61,397.50 are imposed jointly and severally against Ford and Sutter, with $5,496.15 being imposed against Ford alone.[9] While it was Sutter's conduct that led to the mistrial, he was acting as Ford's agent. Under my inherent authority, I may impose sanctions on the party or its attorney. In this case, I find it is appropriate to hold both responsible for the sanctions.

---

8. Ford has indicated that it does not object to the charges as unreasonable. While Ford does not concede Jury Consultants, Inc. was a required expense, it is reasonable to expect such costs in a case of this magnitude.

9. I want to again emphasize that there is no evidence indicating that John Stephenson was in any way involved in violating the Court's orders or that he had any knowledge that Sutter was going to make the statements discussed above. To the contrary, I believe Mr. Stephenson *was not* involved and *is not* culpable for Sutter's misconduct. If Mr. Stephenson can be faulted at all, it is for failing to question Sutter about his incomplete application to appear pro hac vice. *See* discussion, infra. However, it is Sutter's conduct in his opening statement that led to a mistrial being declared, not his incomplete pro hac vice application.

The amount of sanctions represents costs to Lasar and the Court that will be paid as a result of Sutter's misconduct that binds Ford. All of these expenses were incurred in preparing to bring the case to trial and will be reincurred in preparing for the next trial. Accordingly, the expenses are reasonable; were caused by Sutter's bad faith, intentional misconduct; are necessary to reimburse Lasar and the Court; and are necessary to vindicate the Court's authority and to ensure that Ford, through its lawyers, will not disregard or attempt to circumvent court orders in this or any other case.

## B. Contempt

■ In the relevant passages of his opening statement, Sutter set forth a series of facts from which the jury was expected to draw logical inferences. In this case, the only logical inference that can be drawn from Sutter's comments is that Lasar was drinking, or drunk, before his accident and that he was not wearing a seatbelt.

At the time Sutter made his comments, the effect on the jury could not be known. This placed Lasar's counsel in a no-win situation. He could have ignored the reference, hoping against prejudice, yet having no idea how the jury reacted to the comments. Alternatively, he could have asked the Court to admonish the jury that any use of alcohol by Lasar was irrelevant and could not be considered. However, there was great risk that such an instruction would have drawn more attention to the issue and exacerbated what had already fouled the jury. Finally, Lasar's counsel could have attempted to counter the comments by introducing evidence that Lasar was not intoxicated at the time of the accident. This would have put Lasar in the position he sought to avoid through his motion in limine—defending himself against accusations or insinuations that he was drunk at the time of the wreck, an issue that is irrelevant to his legal claim that Ford's vehicle was defectively designed.

Sutter's intentional remarks were designed to inject prejudice and mislead the jury on an irrelevant issue that could not even be proved and are untenable. He maintains that his opening statement was carefully crafted to tell the story of what happened while avoiding any mention of alcohol use or non-use of seatbelts. This justification is disingenuous. Under Sutter's line of reasoning, the only way he would have violated the Court's order would have been by explicitly stating that Lasar was drinking before the accident and that he was not wearing a seatbelt. This ignores the jury's ability to draw logical inferences from his statements. It is also belied by Sutter's initial argument that the order in limine tied his hands and kept the truth from the jury, and his later sworn testimony that in Ohio, the phrase "local establishments" means "restaurants" rather than "bars." (10/10/02 Tr. at 59–60.)

When taking apart Sutter's statement, it is clear that his intent was to poison the jury by implanting in their minds that Lasar was drunk at the time of the wreck. Sutter said that Lasar and friends "visited several establishments." The implication of this is clear—Lasar was with friends visiting and drinking at several bars. There is no other situation, besides "barhopping," where a group of people might visit "several establishments." If it were churches, restaurants, or friends' houses, Sutter would have said as much. Despite Sutter's testimony that in Cleveland visiting establishments and playing pool would mean going to restaurants, such is not the case in Montana and everyone in court knew what he meant

That this was Sutter's intent becomes even more clear when examining the last portion of the statement. Sutter said that Lasar "made the decision to drive himself home," which implies that Lasar made a conscious decision to drive even though he knew he was intoxicated. There is no reason for using the phrase "made the decision" unless Sutter was attempting to imply that Lasar made an incorrect decision when he decided to drive home.

That Sutter intended to introduce the notion of alcohol into the jury's mind is even more clear when considering that the issue is irrelevant. Because this is a products liability case, the focus is on the design of the product, not the conduct of the parties. The events occurring two, four, eight or ten hours before the accident are not relevant, absent some causal link between those events and the accident. Ford not only failed to establish any causal link between the accident and any alcohol use by Lasar, it admitted that it did not have any evidence that Lasar was intoxicated. Despite this failure of proof, Sutter tried to back-door the issue to poison the jury, not through evidence, but through careful and intentional "wordsmithing" in his opening speech to the jury.

The statements in Sutter's opening regarding alcohol are nothing short of contempt of Judge Erickson's and this Court's orders precluding any mention of alcohol use. His opening was well-crafted and, by his own admission, he chose his words carefully. However, his intent in choosing the words he did was not to tell a story about what happened, as he contends, but to poison the jury by implying that Lasar was drunk. In doing so, Sutter was attempting to gain a tactical advantage by focusing the jury's attention on Lasar's conduct rather than on the design of the product. This not only constitutes bad faith, but is a violation of Sutter's ethical duty and his duty as an officer of this Court.

Likewise, Sutter's conduct constitutes contempt of this Court. Clear and definite orders were entered by Judge Erickson and this Court precluding any evidence or discussion of alcohol. Sutter testified that he had read and understood these orders, yet he violated them in his opening statement. While civil contempt does not require a finding of willfulness, it is clear that Sutter willfully violated the in limine orders and did so in bad faith to gain a tactical advantage. Accordingly, Lawrence Sutter is adjudged to be in contempt of court for violating this Court's in limine order precluding evidence or discussion of Lasar's alcohol use.[10]

### C. Pro hac vice

Upon reflection, the egregious nature of Sutter's conduct becomes clear. His testimony at the October 10, 2002 contempt

---

**10.** I do not find Sutter in contempt for violating the in limine order regarding non-use of seatbelts. While I believe Sutter also intended to violate that order by introducing to the jury that Lasar was not wearing a seatbelt, there had been discussion in voir dire by the Court and by Plaintiff's counsel about seatbelts and the jury had been instructed they could not consider use or non-use of seatbelts in their deliberations. While Sutter's statement about "free-floating bodies" was highly charged and intended to introduce lack of seatbelts to the jury, the violation is not as egregious as that regarding alcohol. An instruction that the jury was not to consider seatbelt evidence would likely have countered any prejudice against Lasar from Sutter's statements. Contrarily, Sutter's statements about alcohol were so prejudicial that a limiting instruction would not have been effective and the jury would have been prejudiced against Lasar. Lasar is entitled to a fair day in court. Sutter cut him off by his wordsmithing in a way that could only be corrected by a mistrial.

hearing belies his statement that he did not intend to violate the Court's orders in limine and, in fact, indicates a concerted effort, not only to poison the jurors, but to mislead the Court about his standing as an attorney.

On May 7, 2002, Sutter asked for the privilege of appearing in this court pro hac vice. His affidavit begins as follows:

Lawrence A. Sutter, hereby applies to be admitted as attorney *pro hac vice* in the above-entitled case and states the following facts under *penalty of perjury.*

Pro Hac Vice Aff. of Lawrence A. Sutter, attached as Appendix C (emphasis added).

When Sutter filed his sworn application, under the Local Rules of Procedure of the United States District Court for the District of Montana, Rule 83.3(e)(3)(E), he was required to state under penalty of perjury:

(E) Whether the attorney has ever been held in contempt, otherwise disciplined by any court for disobedience to its rules or orders, or sanctioned under Federal Rules of Civil Procedure 11 or 37(b), (c), (d) or (g) or their state equivalent; the name of the court before which the proceedings were conducted; the date of the proceedings; and what action was taken in connection with those proceedings. A copy of any such contempt, discipline, or sanction order must be attached to the application.

■ Sutter did not disclose in his pro hac vice affidavit that he was twice held in contempt by Judge Patricia Cleary during a trial in Ohio state court. Sutter concealed the fact that in 1999, he filed an affidavit in the Ohio Supreme Court that states, among other things, "that [Judge Cleary] twice found affiant Sutter in contempt, ordered him incarcerated for peri-

ods of ten and thirty minutes...." *In re Disqualification of Cleary, Kaffeman, Exr., et al. v. MacLin, et al.*, 88 Ohio St.3d 1220, 723 N.E.2d 1106, 1107 (2000).

At the hearing in this case to determine whether Sutter should be sanctioned, held in contempt and deprived of his pro hac vice status, Sutter testified about his earlier contempt. First, he testified "*I was found in contempt* because I tried to make a record in the case and the judge would not let me have access to the record." (10/10/02 Tr. at 42.) When caught in a conflict between the language of L.R. 83.3(3)(E), and the language in the Cleary opinion, Sutter tried to back out of the bind by *changing* his sworn testimony. "Well, your honor, to be perfectly honest with you, I told John Stephenson two days ago that I had never been held in contempt, and *I truly believe that to be true.*" (*Id.* at 56 (emphasis added).) [11] Then, referring to the *Cleary* case, he gave more sworn testimony, this time asserting that "... it says in that Opinion that I was held in contempt, *and that's the only reason that I said I was held in contempt today.*" (*Id.* (emphasis added).) This sworn testimony was given despite the Ohio Supreme Court's reliance on Sutter's own affidavit acknowledging he had been held in contempt twice by Judge Cleary.

Sutter wasn't finished with his words-mithing about contempt. Despite testifying on direct examination that "I was found in contempt ..." (*Id.* at 40.), he testified in response to the Court's questions as follows:

There was no finding of contempt, there was just a statement that she was throwing me in jail and she put me in the holding cell for ten minutes. The same thing happened a little bit later in

---

11. I find this sworn testimony to be a continuation of Lawrence Sutter's deliberate effort to deceive the Court. It is impossible to reconcile his sworn testimony in this Court with affidavits he filed in Ohio. His testimony appears to be a willful deception.

that day, there was no contempt hearing, there was no testimony, there was no finding of contempt that I remember from the record whatsoever. So the reason it's not there is very simple. *I didn't even know that there was an inclination that was found into contempt until I read the case again last night—yes, last night.*"

(*Id.* at 57.)[12]

Sutter's twisted testimony borders on perjury if it is not. He told the Ohio Supreme Court he was held in contempt twice by Judge Cleary and he did so in a sworn affidavit. He gave sworn testimony in this Court that "I was found in contempt...." When confronted with the notion that he had concealed that contempt finding here, he ended up testifying "I never considered myself to be in contempt in that case——". Sutter's sophistry can be summed up by a singular Latin phrase *mertiri splendide,* or to deceive magnificently.[13]

The only conclusion that can be reached from this totality of events is that Sutter knew he had been held in contempt by Judge Cleary and consciously decided not to disclose it to this Court because he did not want to risk having his pro hac vice application denied. This fits his pattern, as he did not state in his application that he had never been held in contempt. Rather, he simply omitted any reference to that requirement. This would allow him to argue that he had not lied to the Court. However, upon reviewing the affidavit filed in Ohio and his testimony here, it is clear that Sutter knew he had been held in contempt and omitted any reference to that finding to mislead the Court when it considered his pro hac vice application.

Admission pro hac vice is a privilege this Court grants to out-of-state counsel. In exchange, counsel is expected to abide by the rules and orders of this Court, to behave in an ethical manner, and otherwise act as an officer of the Court. Sutter has not met these standards; his actions were contemptuous, necessitated a mistrial, and caused undue expense and delay to Lasar, his counsel, the witnesses, and the Court. In trying to defend his actions, he has been dishonest, misleading, and evasive. In short, he is not the type of attorney that should be practicing in this Court. At some point, Lawrence Sutter needs to reflect on what it is he does, and what it is he should do. The law has no room for frustrated advocates, motivated by an attitude to win at any cost, who are intent to take matters in their own hands, without regard to the rules or orders of the Court. Accordingly, Lawrence Sutter's pro hac vice status is revoked and he will no longer be allowed to represent Ford in this case or any other case in the Missoula Division of the Montana Federal District Court.

Accordingly, IT IS HEREBY ORDERED that sanctions are imposed against Defendant Ford Motor Company and Lawrence A. Sutter, jointly and severally, in the amount of $61,397.50. An additional $5496.15 is imposed against Ford alone. All sanctions are due and payable

---

12. This is what his Ohio affidavit says:

¶ 5. The most obvious hostility was demonstrated by Judge Cleary in the second day of trial when she twice incarcerated defense counsel.

. . .

¶ 6. Defense counsel was found in contempt a second time during the middle of his cross examination of the plaintiff's expert.... At that time defense counsel was again found in contempt and placed in the holding cell.

Ohio Aff. of Larence A. Sutter, attached as Appendix A.

13. Also translated as "to lie magnificently." Another phrase that may apply is *nescit vox missa reverti,* or think twice before sounding off (literally "a word once uttered cannot be turned back").

immediately, with $61,397.50 to be paid to counsel for Plaintiff and $5,496.15 to be paid to the Clerk of Court, District of Montana. These amounts shall be paid within ten (10) days of the date of this Order.

IT IS FURTHER ORDERED that Lawrence A. Sutter is in contempt of court for violating the Court's order in limine regarding alcohol.

IT IS FURTHER ORDERED that Lawrence A. Sutter's admission pro hac vice is withdrawn, and he is no longer permitted to act as counsel for Ford in this matter.

Time for a status conference in this matter will be set by separate order. The Clerk is directed to immediately notify the parties of the entry of this Order.

### APPENDIX A

IN THE SUPREME COURT OF OHIO

IN RE DISQUALIFICATION
OF JUDGE PATRICIA
CLEARY

Cuyahoga County Court of Common Pleas Court Case No. CV 369033

CASE NO. 99AP118

Dec. 6, 1999

AFFIDAVIT OF DISQUALIFCATION

Now comes defense counsel, Lawrence Sutter and Kenneth Abbarno, being first duly sworn and having personal knowledge of the facts contained therein, according to law, depose and state the following:

1. Lawrence Sutter is counsel of record for the defendants, Yellow Freight System, Inc. and Yellow Corporation, and Kenneth Abbarno is counsel of record for the defendant driver, Robert Maclin, in a wrongful death and survivorship action entitled Kay Marie Kaffeman, Individually and as Executrix of the Estate of Marvin Kaffeman, *Deceased v. Robert E. Maclin, et al.* under the above captioned case number in the Cuyahoga County Court of Common Pleas before Judge Cleary.

2. The decedent was killed when a 1,500 pound trash compactor fell from a tow motor being operated by Robert Maclin after Maclin delivered the freight to the decedent's place of business. The 69 year old decedent was a friend of the driver who was removing the piece of equipment from his Yellow Freight truck as a favor. While Maclin was in the process of removing the trash compactor from the truck, the decedent came up along side the freight to help and would not follow Maclin's instructions to get away from the freight due to the danger.

3. A four day trial was recently completed on November 19, 1999 and resulted in a verdict for the plaintiff with a finding of 47% negligence on behalf of the plaintiff and 53% for defendants. The jury awarded $883,750.00 in compensatory damages (reduced to $468,787.50 due to the plaintiff's negligence) and $1,000,000.00 in punitive damages. Given that post-trial motions are due December 6, 1999, and that the plaintiff will most likely file a motion for pre-judgment interest, it is requested that Judge Clearly be disqualified from ruling on these and any other motions filed prior to appeal on the basis that Judge Cleary has formed a prejudice against the defendants, their counsel and/or their case within the meaning of R.C. § 2701.03.

4. Beginning at the final pre-trial conference and continuing throughout the trial, Judge Cleary, by her

words, deeds, and demeanor, demonstrated a pattern of hostility toward the defendants as well as defense counsel. Most significantly, however. Judge Cleary's statements and actions demonstrate that she has formed a fixed anticipatory judgement regarding the defendant's case and would rule adversely to them on any post trial motions.

5. The most obvious evidence of hostility was demonstrated by Judge Cleary on the second day of trial when she twice incarcerated defense counsel. On each occasion, Judge Cleary slammed the gavel and cleared the courtroom. She then ordered the sheriff to forcibly detain defense counsel and had him locked in a holding cell.

6. The basis of the first incarceration was defense counsel's statement:

Mr. Sutter: Let the record reflect that we requested to make a record.

(The court had repeatedly denied access to the record on the first day of trial and defense counsel was attempting to preserve the appeal rights of his client.) (See attached Trial Transcript, pp. 298–300)

7. Defense counsel was found in contempt a second time during the middle of his cross examination of the plaintiff's expert. By way of background, the court had previously granted the plaintiff's motion in limine to exclude the hearsay statements in the police report. However, the plaintiff's expert testified on direct examination and again during cross examination that he had relied on the police report in formulating his opinion. As a result, defense counsel was attempting to inquire into the report. At that time, defense counsel was again found in contempt and placed in the holding

cell. Defense counsel was then required to complete his cross-examination immediately upon returning from his jail cell to the courtroom. (See attached Trial Transcript, pp. 401–403)

8. The imprisonment of defense counsel was just the final straw in a long litany of conduct demonstrating the trial judge's preconceived hostility toward the defendants. The first indication that Judge Cleary had taken sides in the case was at the final pre-trial conference held on November 8, 1999. On that day, Judge Cleary told defense counsel that we had an "incompetent no good truck driver" operating a tow motor that killed a "nice person."

9. Judge Cleary additionally told defense counsel at the outset that "the defendants' negligence was not even an issue." Indeed, Judge Cleary stated at the pretrial conference that if she did not think she could be reversed in the court of appeals, she would direct negligence against both the driver and the trucking company.

10. Mr. Gordon is the City Operations Manager for Yellow Freight's Richfield terminal and was present at the pre-trial as the representative of Yellow Freight. Not content with that pronouncement, Judge Cleary proceeded to criticize Bill Gordon by calling him a "shop boy from Richfield."

11. At trial, Judge Cleary's attitude against the defendants, defense counsel, and their case, progressed from bad to worse. On the morning of the first day of trial, the court denied the defendants' request to have separate counsel to independently defend both the neg-

ligence and punitive damage claims. Without motion, the court apparently decided to punish the defendants by denying them the right to a separate defense despite independent claims for negligence and punitive damages against each defendant. At the same time, the judge unilaterally struck the affirmative defenses asserted by the defendants in the pleadings that she deemed conflicted.

12. Throughout the course of the trial. Judge Cleary also showed extreme animosity toward the defendants' case. One of the many examples was the court's chastising of defense counsel in front of the jury after he asked the daughter of the deceased, who had been crying on direct examination for more than one-half hour, if she wanted to take a break before proceeding with cross examination. Judge Cleary admonished defense counsel on this occasion for making a "gratuitous comment" in front of the jury.

13. Another example of hostility by Judge Cleary occurred when defense counsel was attempting to view a demonstrative exhibit offered by the plaintiff that was being utilized to cross-examine Mr. Maclin. The court shouted at defense counsel, told him to "sit down" and told him he was "distracting" the jury.

14. Furthermore, Judge Cleary sustained as many as twelve objections adverse to the defense upon her own motion. In ruling on objections, she also shouted at defense counsel, rolled her eyes, and made other facial expressions of disdain directed toward the defendants and their counsel. No such derogatory comments or other hostile behavior were ever directed at the plaintiff or her counsel.

15. Yet another example of Judge Cleary's favoritism toward the plaintiffs' case was in her *sua sponte* stopping of defense counsel on three occasions during voir dire. One instance occurred when defense counsel was attempting to inquire into the panel's familiarity, if any, with lawyers who represented family members in this case. Mrs. Kaffeman was represented by plaintiffs' counsel who was sitting at the trial table while the daughters were represented by additional counsel who was seated in the back of the courtroom. Defense counsel was unable to question whether any of the jurors were familiar with the additional lawyers seated in the back of the courtroom who represented other persons involved in the case.

16. In addition, after opening statements. Judge Cleary admonished defense counsel for inquiring of the jurors as to the word "accident". Judge Cleary ordered that the word "accident" not be used by the defense in the entirety of the case. Precluding the defense from using words like "accident" clearly reveals that Judge Cleary had made up her mind on how she wanted this case to result. (See attached Trial Transcript, p. 150)

17. Based upon all of the foregoing. Judge Cleary has formed a prejudice against the defendants, their counsel, and/or their case within the meaning of R.C. § 2701.03. In addition to her hostility toward defense counsel during the pretrial and trial proceedings. Judge Cleary's comments indicate that

she does not have an open mind such that a reasonable person could question whether the post trial motions will be governed by the law and the facts.

18. No hearing has been scheduled in this case.

/s/Lawrence Sutter, Esq.

REMINGER & REMINGER CO., L.P.A.
113 St. Clair Avenue, 7th Floor
Cleveland, Ohio 44114
Attorney for Defendants.
Yellow Freight System, Inc. and Yellow Corporation

/s/Kenneth P. Abbarno, Esq.
113 St. Clair Avenue, 7th Floor
Cleveland, Ohio 44114
Attorney for Defendant.
Robert E. Maclin

* * * * * * *

STATE OF OHIO

COUNTY OF CUYAHOGA

SWORN to before me and SUBSCRIBED in my presence at Cleveland, Ohio this 3rd day of December, 1999.

/s/James T. Turek, Attorney at Law
Notary Public-State of Ohio

**CERTIFICATE OF SERVICE**

I certify that copies of Affidavit of Disqualification were mailed, via ordinary U.S. Mail, this 3rd day of December, 1999 to:

Hon. Patricia A. Cleary
Cuyahoga County Court of Common Pleas
Justice Center
1200 Ontario Street Cleveland, OH 44113-1678
Philip A. Ciano
1995 Huntington Building
925 Euclid Avenue Cleveland, Ohio 44115, Counsel for Plaintiff
George F. Lonjak

1995 The Huntington Building
925 Euclid Avenue
Cleveland, Ohio 44115, Counsel for Plaintiff

/s/Kenneth P. Abbarno
Lawrence Sutter
Kenneth P. Abbarno

* * * * * * *

tell you things about staying away from loads when they are suspended in the air?

THE COURT: Approach the side bar.

(Thereupon, a discussion was had at the side bar off the record.)

MR. SUTTER: Let the record reflect that we requested to make a record.

THE COURT: You may—we are going to take a recess right now, ladies and gentlemen. We will be on break for ten minutes.

(Thereupon, the jury was excused from the courtroom.)

(Thereupon, the following proceedings were had in open Court, outside the presence of the jury:)

THE COURT: You may be seated.

Prior to the commencement of trial, there was some motions in limine filed on—by both parties, and with regard to several of those motions, I discussed them on the record. In particular was a motion in limine concerning the testimony of this witness, and I had indicated at that time that she would not be permitted to be used as an expert witness, to discuss whether or not her father was incorrect in standing in proximity to the truck at the time of the injury. I indicated that she certainly as a fact witness can testify with regard to the events and where she stood.

During the course of commencement of cross-examination, that issue was gotten into by defense counsel. I called

him up to side bar, and I indicated that I had ruled on this previously and we had some discussion about the law, and I indicated he would get access to the record at a later time but I wasn't going to do it at this time.

We went to resume testimony, and Mr. Sutter at that time, in front of the jury, demanded access to the record. And that conduct in front of the jury is contemptuous. I am going to deal with it right now.

Mr. Sutter, you are remanded to the custody of the Sheriff's Office until the end of the break.

MR. SUTTER: Until?

THE COURT: All rise.

The end of the break.

And again, these are going to be escalating penalties. You have been cautioned about challenging me in front of the jury.

MR. SUTTER: Your Honor, may I make a record now?

THE COURT: I said later, and it is when I choose.

(Thereupon, a recess was taken.)

(Thereupon, the jury entered the courtroom, and the following proceedings were had in open Court:)

THE COURT: Miss, you may resume the stand.

Mr. Abbarno, you may proceed with your cross-examination.

MR. ABBARNO: Thank you.

*BY MR. ABBARNO:*

Q You knew Bobby from before April 6th of 1998, other times he had made deliveries?

A Yes.

Q And in those other times that he had made deliveries, he had parked his truck and trailer actually right out on Euclid Avenue; is that right?

A In different times, yes.

Q And he also parked the truck and trailer in that same general area on April 6th of 1998; isn't that right?

orientation of the pallet, did they?

A It was never asked.

Q All right. I looked in the police report last night—

THE COURT: That is sustained.

Q Did you see it in the police report?

THE COURT: That is sustained. And we are taking a recess at this time.

Ladies and gentlemen, we will stand on break until 1:30.

(Thereupon, the jury was excused from the courtroom.)

(Thereupon, the following proceedings were had in open Court, outside the presence of the jury:)

THE COURT: Before I begin, can you tell me one reason why I shouldn't have you spend the lunch hour in the lockup?

MR. SUTTER: What reason would that be for?

THE COURT: For defying my repeated rulings with regard to use of the police report, that I was not going to permit the hearsay that was contained therein to be entered into this case, and that's why I repeatedly did not permit you to make reference to the police report. I made multiple rulings on that point.

MR. SUTTER: I would agree with your Honor, until this witness testified that he relied upon it in direct examination. That clearly opens the door. And as this Court is well aware, a motion in limine is only preliminary in nature. Once he opens the door, I have the full right and the obligation to my client—

THE COURT: Unless I ruled otherwise, which I did, again, during the course of this statement that I had ruled that you were not to get into it.

Deputy, a half hour.

You need a time out.

And you are not going to go on to the record at this time.

MR. ABBARNO: Are you denying access at this time?

THE COURT: At this time. At 1:30 you can go on the record with regard to the daughter testifying as an expert concerning her training on the tow motor.

MR. ABBARNO: I also have some other items I would also like to make on the record as we stand here right now. I have other items with respect to the manner that this trial is proceeding, your Honor, and I would like to have the opportunity, because I have the right, also, likewise, to make that record, and I thus far have been denied that ability on four occasions.

THE COURT: I disagree with that. I, as an experienced trial attorney myself, I am very cognizant of the use of the record, and I understand when it is necessary to preserve an objection for the record. If you want to make a motion, you can make it.

The only outstanding matter with regard to access to the record concerns the daughter testifying as an expert concerning her so-called training by her father.

Off the record.

We are in recess until 1:30.

(Thereupon, a luncheon recess was taken until 1:30 p.m., Wednesday, November 17, 1999, at which time the following further proceedings were had:)

Also, I don't want any further mischaracterization of these events to the jury with the words of accident. Obviously all the negligence cases involve by their very nature accidents, so I think that's misleading to the jury. It is not going to happen again.

The motion in limine with regard to the testimony of the decedent's daughter, Anita Savastano, is granted. She obviously can testify with regard to anything she saw, but she is not testifying as an expert in this case and she will not be permitted to so testify.

Is there anything specific you need for me to discuss?

MR. ABBARNO: Yes, your Honor.

From us first, with the punitive damages claim pending and as it relates to Yellow Freight's activities in handling the Harmony Enterprises freight, the fact that we have never mishandled this type of freight is relevant as it relates to the punitive damages claim of packaging that product, and specifically putting it on a pallet for travel throughout our system.

In addition, Mr. Cramer will testify that he doesn't—he is not an expert in shipping. Once they

## SUPPLEMENTAL AFFIDAVIT OF DISQUALIFICATION

Now comes defense counsel, Lawrence A. Sutter and Kenneth P. Abbarno, being first duly sworn and having personal knowledge of the facts contained therein, according to law, depose and state the following by way of a Supplemental Affidavit of Disqualification:

1. Based upon Judge Cleary's response, it is evident that Judge Cleary has formed a prejudice against the defendants, their counsel and/or their case within the meaning R.C. § 2701.03. Judge Cleary's admits her preconceived notion of the result in this case by virtue of the following statement in her response:

 Knowing liability was clear and a large award would be leveled against their client, trial counsel's acts of disrespect and misconduct escalated with the progress of trial.

This comment amplifies that Judge Cleary had made up her mind as to how she wanted this case to result prior to impaneling the jury. Despite Judge Cleary's allegation that "liability was clear" the jury determined that the plaintiff was 47% negligent.

2. The Motion for Summary Judgment in no way attributed negligence and causation solely to Mr. Maclin. Rather, the Motion for Summary Judgment sought to assert a defense of loaned servant. If this defense were adopted by the court then negligence claims against Mr. Maclin would have been barred by virtue of the doctrine of fellow-servant immunity.

3. Defense counsel was first informed of the inability to raise this issue at trial due to an "ethical conflict" on the morning of trial. (See attached trial transcript, pp. 3–7). This "ethical conflict" was raised sua sponte by the court.

4. The court's prejudicial attitude is further demonstrated by comments made in denying defense counsel's motion for a mistrial. The court stated:

I find your comments to be untrue with regard to my shouting. My problem was I was forced to raise my voice. I assumed since counsel are admitted members of the bar, that they are not stupid, and so when I would rule and my rulings would be ignored. I was assuming that it was because I could not be heard over the ventilation system, so I raised my voice.

(*See* trial transcript at p. 574)

5. Judge Cleary has also admitted that she has formed a prejudice against defendant by falsely accusing defense counsel of "purposeful and cal-culated" actions during trial to obtain a mistrial. The record of the trial does not support this allegation.

6. Defense counsel further state that to the extent Judge Cleary has suggested that statements in the affidavit are untrue, the Supreme Court is invited to review the entire trial transcript which will be provided upon request.

7. The record, Affidavit of Disqualification, Response of Judgment and this Supplemental Affidavit demonstrate that Judge Cleary has formed a prejudice against the defendants, their counsel and/or their case within the meaning of R.C. § 2701.03. Judge Cleary does not have an open mind such that a reasonable person could question whether the post-trial motions will be governed by the law and facts.

/s/Lawrence Sutter, Esq.
REMINGER & REMINGER CO., L.P.A.
113 St. Clair Avenue, 7th Floor
Cleveland, Ohio 44114
Attorney for Defendants,
Yellow Freight System, Inc. and
Yellow Corporation

/s/Kenneth P. Abbarno, Esq.
REMINGER & REMINGER CO., L.P.A.
113 St. Clair Avenue, 7th Floor
Cleveland, Ohio 44114
Attorney for Defendant,
Robert E. Maclin

* * * * * * *

STATE OF OHIO

COUNTY OF CUYAHOGA

SWORN to me before and SUBSCRIBED in my presence at Cleveland, Ohio this 29th day of December, 1999.

/s/Barbara Marie Kastak

Notary Public, State of Ohio

## CERTIFICATE OF SERVICE

I certify that copies of the affidavit of Disqualification were mailed, via ordinary U.S. Mail, this 3d day of December, 1999 to:

Hon. Patricia A. Cleary

Cuyahoga County Court of Common Pleas

Justice Center

1200 Ontario Street

Cleveland, Ohio 44113-1678

Philip A. Ciano

1995 Huntington Building 925 Euclid Avenue

Cleveland, Ohio, Counsel for Plaintiff

George F. Lonjak

1995 The Huntington Building

925 Euclid Avenue

Cleveland, Ohio, Counsel for Plaintiff

/s/Kenneth P. Abbarno

Lawrence Sutter

Kenneth P. Abbarno

\* \* \* \* \* \* \*

## TUESDAY MORNING SESSION, NOVEMBER 16, 1999

THE COURT: The Court will proceed with instructions with regard to voir dire.

I have gotten some pleadings from Larry Sutter, indicating he is now new counsel for Yellow Freight. Is that correct?

MR. SUTTER: Yes, your Honor.

THE COURT: And you work for Reminger's office?

MR. SUTTER: I do.

THE COURT: During the course of the final pre-trial in this matter, in reading over proposed jury instructions, I was troubled by the fact that there was one counsel representing Robert Maclin and Yellow Freight, because there is an intent by Yellow Freight to escape liability in this matter by claiming that Robert Maclin was not acting within the scope of his employment, and that type of a position would place, obviously, Mr. Maclin in harm's way, and I'm not comfortable with the idea that one law firm represented both of these individuals. And I don't see how bringing in a second counsel cures that defect or ethical problem.

MR. SUTTER: Well, your Honor, as you know, I was not involved in the earlier part of the litigation. Mr. Abbarno and I have not collaborated on this case. I have entered as separate counsel for Yellow Freight and intend to represent their interests in this matter.

THE COURT: The ethical problem still stands there.

And just going over the pleadings in this case last night, I think it was—I can't find my notes before me—I think it is the 23rd count of the complaint that references this. So this ethical problem existed long ago.

And your comments that you haven't had access or used any of the materials in this case to prepare yourself to represent Yellow Freight really doesn't pass the straight face case with me. I can't believe you didn't read the briefs or have access to the depositions.

MR. SUTTER: I did read depositions.

THE COURT: Who prepared the depositions?

MR. SUTTER: Who prepared the depositions?

THE COURT: Yes, who participated in creating and preparing those depositions?

MR. SUTTER: I don't understand what your question is. Counsel of record obviously was at the deposition. All I did was review the official court transcripts, which are the depositions.

THE COURT: I think there is a grievous ethical problem here with the same

law firm representing two people or two entities with conflicting interests in this case, and at this posture I really don't know what the appropriate way to proceed is. I'm very disinclined to continue this case.

I'm going to preclude the introduction of the conflicting defense in this matter, and I'm going to preclude any attempt by Yellow Freight to place Mr. Maclin as solely responsible for this accident. I don't know how else to cure this defect.

MR. SUTTER: Well, I would like my objection to your ruling noted for the record. And I want to know whether you are including in that ruling my ability to differentiate between the punitive damage claim and the negligence claims. Because I believe the Eighth District has clearly indicated that Yellow Freight does have a right to separate counsel on the punitive damage issue.

THE COURT: I think that those ethical matters should have been handled long ago in this particular matter. This is not a conflicting defense that suddenly arose during the course of discovery, based on the response or the answer that I referenced earlier, the paragraph 23 that I referenced to.

If you want to give me some case law on it, and obviously keeping in mind the ethical problem in this case.

Unless you have a better suggestion, on behalf of the plaintiffs.

MR. CIANO: No, your Honor. We don't at this time. I had asked Mr. Sutter for some case law, which we got last night, and I did review the cases. Neither of them, from my review, seem to support the position that they have taken.

THE COURT: Position about what?

MR. CIANO: As far as splitting their counsel.

And I told them we would not object because it wasn't an ethical issue on our behalf. I just asked for the legal position on it, and he gave us the cases, and they didn't seem to support their position, from my review. We still haven't received a motion to withdraw from Mr. Abbarno. We've been told at last week's depositions at one point they are out and at one point they are in.

THE COURT: This is a hornet's nest of ethical problems.

I made my decision on it. If you want to deal with it in a different form, you are welcome to do that.

The jury is on their way up.

During the course of voir dire, I don't want counsel repeating any questions that I ask the jurors. More appropriate, you are to ask questions to the panel generally instead of repeating the same instructions over and over again.

I will be giving the jurors the instructions of law at the end of the case. Therefore, I don't want counsel rephrasing the instructions for the jurors during voir dire. I'm afraid it will confuse them. For example, I don't want you talking about what burden of proof is and things like that and comparing civil to criminal cases. I will very clearly tell them what the burden of proof is in a civil case.

You are not allowed to ask the jurors what TV shows they watch, what magazines they receive, what bumper stickers they have on their car, about their medical histories, that of their children, spouse, close friends and relatives. We are going to try to keep this to the relevant issues.

case to attempt to provoke a mistrial, but it didn't work in this case.

I find your comments to be untrue with regard to shouting. My problem was I was forced to raise my voice. I assumed since counsel are admitted members of the bar, that they are not stupid, and so when I would rule and my rulings would be ignored, I was assuming that it was be-

cause I could not be heard over the ventilation system, so I raised my voice.

Counsel were not chastised in front of the jury.

We are going to resume the trial. The Court has to recess at 11:30 until 1:30 because of a prior commitment, and I hope to have the jury instructions at least typed up so the copies can be made available to counsel over the lunch break. But we are going to proceed.

So you can bring the jury out.

(Thereupon, the jury entered the courtroom, and the following proceedings were had in open Court:)

THE COURT: And on behalf of the plaintiff.

MR. CIANO: Your Honor, at this time

## APPENDIX B

## RULE 83

### DISTRICT COURT RULES AND DIRECTIVES

#### 83.1 DECORUM.

**(a) Opening Court.** When the Court first convenes in the morning and after the noon recess, the Court Crier shall, in an appropriate manner, announce the opening of court, and all persons in attendance in the courtroom shall rise until the judge has taken the bench.

**(b) Robes.** Judges of this Court shall wear judicial robes when presiding in open court.

#### 83.2 ATTIRE

Lawyers shall wear appropriate professional attire for all proceedings before the Court.

#### 83.3 ADMISSION TO AND PRACTICE IN THIS COURT.

**(a) Admission to the Bar of this Court.** Admission to the Bar of this Court is limited to attorneys of good moral character who are members in good standing of the State Bar of Montana.

**(b) Procedure for admission.** Each applicant for admission shall present to the clerk a written petition for admission, stating the applicant's residence and the date of admission to the State Bar of Montana. The petition shall be accompanied by a certificate of a member of the Bar of this Court that the applicant is of good moral character and a member in good standing of the State Bar of Montana. Upon qualification, the applicant may be admitted, upon oral motion or without appearing, as determined by the Court, by signing the prescribed oath and paying the prescribed fee.

**(c) Practice in this Court.** Except as otherwise provided in this Rule, only members of the Bar of this Court shall practice in this Court.

**(d) Attorneys for the United States.** An attorney who is not eligible for admission under L.R. 83.3(a) but who is a member in good standing of and eligible to practice before the Bar of any United States Court or of the highest court of any state, or of any territory or insular possession of the United States, and who is of good moral character, may practice in this Court in any matter in which that attorney is employed or retained by the United States or its agencies and is representing the United States or any of its officers. Attorneys so permitted to practice in this Court are subject to the jurisdiction of the Court with respect to their conduct to the same extent as members of the Bar of this Court.

**(e) Pro hac vice.**

(1) An attorney not eligible for admission under L.R. 83.3(a), but who is a member in good standing of and eligible to practice before the Bar of

any United States Court or of the highest court of any state or of any territory or insular possession of the United States, who is of good moral character, and who has been retained to appear in this Court, may, upon written application to and in the discretion of the presiding judge, be permitted to appear and participate in a particular case.

(2) Unless authorized by the Constitution of the United States or acts of Congress, an attorney is not eligible to practice pursuant to this subsection if (A) the attorney resides in Montana, or (B) the attorney is regularly employed in Montana.

(3) Application to appear pro hac vice shall be filed and served on all parties, and shall state, under penalty of perjury:

(A) the attorney's state or territory of residence and office addresses;

(B) by what court(s) the attorney has been admitted to practice, the date(s) of admission, and the date(s) of termination of admission, if any;

(C) that the attorney is in good standing and eligible to practice in these courts;

(D) that the attorney is not currently suspended or disbarred in any other court.

(E) whether the attorney has ever been held in contempt, otherwise disciplined by any court for disobedience to its rules or orders, or sanctioned under Federal Rules of Civil Procedure 11 or 37(b), (c), (d) or (g) or their state equivalent; the name of the court before which the proceedings were conducted; the date of the proceedings; and what action was taken in connection with those proceedings. A copy of any such contempt, discipline, or sanction order must be attached to the application;

(F) if the attorney has concurrently or within the year preceding the date of application made any pro hac vice application to this Court, the title and the cause number of each matter in which an application was made, the date of application, and whether or not the application was granted; and

(G) the name, address, telephone number, and written consent of local counsel who is a member of the Bar of this Court and with whom the Court and opposing counsel may readily communicate regarding the conduct of the case, upon whom papers shall be served, and who will be responsible to participate as required under subsection (f) of this Rule.

**(f) Duties of local counsel.** Unless otherwise ordered, local counsel designated pursuant to this Rule shall sign all pleadings, motions and briefs. In all cases, local counsel shall participate actively in all phases of the case, including, but not limited to, attendance at depositions and court proceedings, preparation of discovery responses and briefs, and all other activities to the extent necessary for local counsel to be prepared to go forward with the case at all times. The Court, upon motion by local counsel, may waive this Rule on a showing of extraordinary circumstances. Upon waiver of this Rule by the Court, all papers subsequently filed shall be signed by counsel actively involved in the case. Such a waiver is not to be routinely granted.

## 83.4 NOTICE OF CHANGE OF STATUS.

An attorney who is a member of the Bar of this Court or who has been permitted to

practice in this Court under L.R. 83.3(a), (d), or (e) shall promptly notify the Court of any change in the attorney's status in another jurisdiction which would make the attorney ineligible for membership in the Bar of this Court under L.R. 83.3 or ineligible to practice in this Court under L.R. 83.3.

## 83.5 ATTORNEY UNDER APPOINTMENT OF COURT.

**(a) Compensation.** It shall be the duty of an attorney to act without compensation whenever the attorney is appointed by the Court to represent an indigent person in any proceeding not covered by the provisions of 18 U.S.C. § 3006A.

**(b) Gratuities.** Attorneys appointed by the Court to represent an indigent person shall not, without specific approval of the Court, accept or solicit any money for any purpose from any person on account of the representation. Any attorney violating this Rule will be disciplined by the Court. If it comes to the attention of any attorney

### APPENDIX C

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF MONTANA

### MISSOULA DIVISION

STEVEN MARK LASAR, Plaintiff,

vs.

FORD MOTOR COMPANY, Defendant.

Cause No. CV-99-177-M-DWM

May 7, 2002.

### PRO HAC VICE APPLICATION TO APPEAR AS COUNSEL IN A PARTICULAR CASE

LAWRENCE A. SUTTER, hereby applies to be admitted as attorney pro hac vice in the above-entitled case and states the following facts under penalty of perjury:

1.

. I reside in the State of Ohio and my office address is as follows:

Sutter O'Connell Mannion & Farchione
3600 Erieview Tower
1301 East 9th Street
Cleveland, Ohio 44114
Phone: (216) 928-2200
Fax: (216) 928-4400
E-mail: lsutter@sutter-law.com

2.

I have been licensed to practice law in the State of Ohio. The Supreme Court of Ohio and USDC Federal District of Ohio. I have also been admitted pro hac vice in the United States District Courts and State Courts of General Jurisdiction in many states.

3.

At all times since being admitted, I have been and continue to be a member in good standing authorized to practice before the highest courts in this state.

4.

I am not currently suspended or disbarred in any court.

5.

In the past year, the only application I have made for *pro hac vice* admission was in the United States District Court, Great Falls Division, in the case captioned *Ed Noble, et al. v. Ford Motor Company, et al.* Case No.: CV-01-106-GF-SHE.

6.

Co-counsel in this case is John D. Stephenson whose address is as follows:

John D. Stephenson
Jardine, Stephenson, Blewett & Weaver, P.C.

7th Floor, U.S. Bank Building

P.O. Box 2269

Great Falls, MT 59403

Telephone: (406) 727–5000

Mr. Stephenson has consented to the granting of this application.

7.

If admitted, I agree to observe the following conditions:

a. I will act as co-lead counsel.

b. John Stephenson shall act as the other co-lead counsel and shall be kept advised of all developments in the case with the authority to act as attorney of record for all purposes.

c. Both lead counsel shall conduct the trial of the case and shall appear at all hearings related to the case.

d. Briefs and pleadings prepared in my office shall constitute my own work product and shall be signed by me. Montana counsel shall not sign briefs, pleadings and motions prepared in my office.

DATED this ___ day of April, 2002.

/s/Lawrence A. Sutter

The undersigned, John D. Stephenson, hereby consents to the granting of this pro hac vice application.

/s/John D. Stephenson

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **PRO HAC VICE APPLICATION TO APPEAR AS COUNSEL IN A PARTICULAR CASE** was served upon the following by mail, hand-delivery, Federal Express or Fax:

[X]U.S. mail []Federal Express

[]Hand-delivery []Fax

Paul C. Meismer CAREY, MEISMER & McKEON, PLLP

225 West Broadway

P.O. Box 8659

Missoula, MT 59807-8659

Michael D. Weisman

Daniel T.S. Hefferman

Pierce J. Reed

WEISMAN & ASSOCIATES, P.C.

114 State Street

Boston, MA 02109

DATED this 7th day of May, 2002.