**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN MARK LASAR,
                *Plaintiff-Appellee,*

v.

FORD MOTOR COMPANY,
                *Defendant-Appellant,*

and

LAWRENCE SUTTER,
                *Appellant.*

Nos. 03-35093
       03-35486

D.C. No.
CV-99-00177-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
May 5, 2004—Seattle, Washington

Filed March 3, 2005

Before: A. Wallace Tashima, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Paez

**COUNSEL**

Theodore J. Boutrous, Jr., Los Angeles, California, for appellant Lawrence Sutter.

Richard A. Derevan, Irvine, California, for appellant Ford Motor Co.

Michael D. Weisman, Boston, Massachusetts, for the appel-lee.

## OPINION

PAEZ, Circuit Judge:

While driving a Ford pick-up truck, plaintiff Mark Lasar was involved in a rollover accident. Lasar subsequently brought a products liability damages action against Ford Motor Company. This appeal arises from sanctions that the district court levied against Ford and its counsel, Lawrence Sutter, for statements that Sutter made during his opening statement to the jury that ultimately resulted in a mistrial.

In imposing sanctions, the district court determined that Sutter violated two pretrial in limine orders prohibiting Ford from introducing evidence that Lasar had been drinking before the accident and had not been wearing his seatbelt at the time of the accident. At the conclusion of a sanctions hearing, the district court ordered Ford and Sutter to pay sanctions to Lasar and to the District Court. The sanctions were intended to reimburse Lasar for unnecessary expenses and attorney's fees, and to reimburse the district court for the costs of empaneling the jury. The court also found Sutter in contempt of court for deliberately violating the pretrial order relating to alcohol use. Finally, the court revoked Sutter's *pro hac vice* status and permanently barred Sutter from appearing *pro hac vice* in the Missoula Division of the United States District Court for the District of Montana.

Ford and Sutter timely appealed the district court's ruling. We address four questions relating to the court's imposition of sanctions. First, did the district court provide adequate due process? Second, did the court comply with the procedural requirements of its local rules? Third, did Sutter violate the

pretrial evidentiary rulings and fail to disclose a prior disciplinary matter in his *pro hac vice* application? Finally, were the sanctions, and rulings relating to Sutter's *pro hac vice* status, an appropriate response to Sutter's misconduct? With one limited exception, we answer each question in the affirmative. We affirm the district court's ruling as to all sanctions except the permanent ban on Sutter's *pro hac vice* appearance before that court, which we reverse.

We also must decide whether the settlement of the dispute between Ford and Lasar while these appeals were pending renders them moot, so that we lack jurisdiction. Although the settlement agreement barred Ford from obtaining reimbursement of the monetary sanctions it paid to Lasar, we conclude that the agreement did not affect Ford's right to seek reimbursement of the sanctions it paid to the district court. Similarly, since Sutter was not a party to the settlement agreement, we conclude that it could not affect his right to appeal the sanctions award, the contempt citation or the *pro hac vice* rulings.[1]

## I.

Steven Lasar was severely injured when he was ejected from his Ford Ranger during a rollover accident. Lasar filed a products liability action against Ford alleging that Ford had designed the Ranger's door-latch mechanism defectively. The district court granted *pro hac vice* status to Sutter, an attorney from Ohio, to represent Ford at trial. Local Rule 83.3(e), United States District Court for the District of Montana ("Local Rules"). John Stephenson served as Sutter's local co-counsel.

Before the jury trial began, the magistrate judge issued two

---

[1]Although Lasar does not have a personal stake in the outcome of this appeal, he nonetheless filed a brief supporting affirmance of the district court's sanctions order. We appreciate the thorough briefing by all parties.

in limine rulings. The first prohibited Ford from introducing evidence that Lasar had consumed alcohol on the day of the accident. The second prevented Ford from telling the jury that Lasar was not wearing his seat belt at the time of the accident. Ford challenged these rulings before the district judge, but the district judge overruled both objections.

When the trial began, Sutter made two comments during his opening statement that the district court ultimately determined were violations of the pretrial orders. Initially, Sutter told the jury:

> At about 5:00 that morning, Mr. Lasar got out of bed and went hunting for the morning. Some time in the afternoon, he met up with some of his friends and spent the day playing pool, visiting some local establishments. Somewhere around 10:00 that night, he made the decision to drive himself home. He got into his car and he began his way back to his homestead.

Later in his opening statement, Sutter stated:

> Now, inside the vehicle, something else was going on; Lasar was what we call a free-floating body. His body was banting about inside the car as it was rolling over. And because of what happens during the rollover, something all of us learned in high school and most of us tried to forget, centrifugal force. All that is, is something spinning around like a yo-yo on a string; it wants to keep going outward.

Lasar's attorney requested a sidebar at the conclusion of Sutter's opening statement, but the district court did not allow Lasar to present his objection until the end of the day. When the court permitted Lasar's attorney to explain the objection, Lasar's attorney argued that Sutter's reference to Lasar "visiting some local establishments" and to Lasar's "free-floating body" violated the evidentiary rulings. Although Lasar's

attorney requested a curative instruction at a later point in the trial, he also noted a dilemma: "how do we correct the problem without drawing attention to it?"

The district court immediately stated that both of Sutter's statements were "absolutely unacceptable violations of the orders in limine . . . ." The court then informed Lasar's attorney that it would grant a mistrial and award Lasar his costs. Before finally deciding the issue, however, the district court offered Sutter and Stephenson an opportunity to respond. Sutter, in response to the court's concerns, argued that he had utilized great care in preparing his opening statement, that his reference to Lasar playing pool at some local establishments was ambiguous, and that it was impossible to describe the accident without discussing Lasar's free-floating body. Lasar's attorney requested that the district court direct a verdict in Lasar's favor, but the district court rejected this option, stating "Ford has a legitimate defense."

The next morning, Lasar moved for a mistrial. After hearing additional oral argument about Sutter's opening statement, the district court stated that it was "inconceivable" that Sutter could argue "with a straight face" that he had not violated the order regarding alcohol. The court determined that a curative instruction would not "overcome the prejudice" of Sutter's opening statement. Accordingly, the court granted Lasar's motion for a mistrial and discharged the jury.

The court also notified the parties that it was prepared to impose monetary sanctions based on "an intentional effort, reckless and in bad faith . . . to ignore the court's orders . . . ." The court ordered Lasar's attorneys to prepare an affidavit detailing Lasar's costs and attorney's fees incurred over the previous two weeks and to serve the affidavit on Ford and Sutter by the end of the day. The court also orally notified the parties that it would issue an order to show cause ("OSC") why Sutter should not be held in contempt and have his *pro*

*hac vice* status revoked. Later that day, the district court issued an OSC.

Two days later, the court held a sanctions hearing. At the hearing, Stephenson, Sutter's co-counsel, questioned Sutter. During the course of his examination, Stephenson asked Sutter, "Have you ever been found in contempt?" Sutter replied:

> I was involved in a case approximately two years ago called [Kaffeman] vs. Yellow Freight with a judge in Cleveland, Ohio by the name of Patricia Cleary who found me in contempt for attempting to place on the record certain objections. After the trial, I filed a motion with the Ohio Supreme Court to have her recused from that litigation. The Ohio Supreme Court reviewed the transcript in total and issued an opinion exonerating me and indicating that I had taken reasonable steps to put things on the record and removing Judge Cleary from further activity in that case.

On cross-examination, Sutter again testified that he "was found in contempt" in the *Kaffeman* case.[2] Lasar's attorney then attempted to introduce an Ohio Supreme Court opinion in that case, which resulted in the disqualification of the trial judge. *See In re Disqualification of Cleary*, 723 N.E.2d at 1108. Stephenson did not object, stating, "[w]e cited to the Court[;] we have no objection."

The court also questioned Sutter about the court's rulings in the *Kaffeman* case. For the third time, Sutter testified that the judge in the *Kaffeman* case had "held me in contempt." The district court asked Sutter why he had not disclosed the

---

[2]This case, *Kaffeman v. Maclin*, resulted in two published opinions: *In re Disqualification of Cleary*, 723 N.E.2d 1106 (Ohio 2000), and *Kaffeman v. Maclin*, 781 N.E.2d 1050 (Ohio Ct. App. 2002), both of which we discuss in greater detail in Section IV.B.

contempt citation in his *pro hac vice* application. Sutter initially responded that under his reading of the Local Rules, he "thought that the only thing I had to disclose was if I had been sanctioned by a Bar Association or the local investigatory body." The court pointed out that the Local Rules require attorneys applying for *pro hac vice* admission to disclose if they have "ever been held in contempt, [or] otherwise disciplined by any court for disobedience to its rules or orders . . . ." Local Rule 83.3(e)(3)(E). Sutter then explained:

> Well, Your Honor, to be perfectly honest with you, I told John Stephenson two days ago that I had never been held in contempt, and I truly believe that to be true. I have [sic] the copy of the . . . Patty Cleary [the judge in *Kaffeman*] case faxed to me last night and it says in that opinion that I was held in contempt, and that's the only reason that I said I was held in contempt today. There was no such hearing like this, there was nothing like this that occurred.

At the conclusion of the hearing, the district court informed the parties that it intended to impose monetary sanctions, but would take into account Sutter's testimony and consider whether to hold Sutter in contempt or "deprive him of his right to appear in this court *pro hac vice*."

Relying mainly on its inherent authority,[3] the district court imposed monetary sanctions, held Sutter in contempt, and

---

[3]In imposing monetary sanctions, the district court relied on both its inherent authority and Local Rule 83.14(b) and (c). Local Rule 83.14(b) provides that "[a]n attorney may be subject to disciplinary action . . . for [a] . . . violation of any court order." Local Rule 83.14(c) specifies that "[d]iscipline may consist of one or more of the following: (1) disbarment; (2) suspension; (3) public censure; (4) private reprimand; (5) probation with or without conditions; (6) restitution; (7) fines and/or assessment of costs; and (8) referral to appropriate disciplinary authority." The district court did not rely on Local Rule 83.14 when it held Sutter in contempt and revoked his *pro hac vice* status.

revoked his *pro hac vice* status. *Lasar v. Ford Motor Co.*, 239 F. Supp. 2d 1022, 1025-26 (D. Mont. 2003). The court imposed monetary sanctions against Ford and Sutter because Sutter "intentionally and in bad faith" violated the in limine orders and monetary sanctions were "necessary to reimburse Lasar and the Court [and] . . . to vindicate the Court's authority and to ensure that Ford, through its lawyers, will not disregard or attempt to circumvent court orders in this or any other case." *Id.* at 1027, 1031. The court awarded $61,397.50 to Lasar—assessed jointly and severally against Ford and Sutter —and required Ford to pay $5,496.15 to the Clerk of Court to reimburse the court for the cost of empaneling the jury. *Id.* at 1028. Second, the court found Sutter in contempt because of his violation of the order in limine prohibiting references to Lasar's use of alcohol.[4] Although the district court's order is not precise, the contempt finding provided an alternative basis for the imposition of compensatory monetary sanctions against Sutter. *Id.* at 1031-32. Third, the district court revoked Sutter's *pro hac vice* status on the basis of Sutter's violation of both pretrial orders, his failure to disclose the contempt citation in the *Kaffeman* case, and his dishonest testimony at the sanctions hearing. *Id.* at 1034.

Finally, the district court concluded that Sutter would "no longer be allowed to represent Ford in this case or any other case in the Missoula Division of the Montana Federal District Court." *Id.*

The district court later denied Ford and Sutter's motion for reconsideration. In its order, the court clarified that "Sutter's failure to disclose his prior contempt sanction was not *the* reason for holding him in contempt or for revoking his *pro hac vice* status. Rather, it was additional evidence of his dishonesty, and it was considered as a result of his own testimony."

---

[4]The court did not rely on Sutter's violation of the seat-belt related order to support the contempt citation because the court determined that this violation could have been cured by a jury instruction. *Id.* at 1032 n.10.

After Ford and Sutter filed their appeals, Ford settled Lasar's damages action and the district court dismissed the case with prejudice. Ford and Sutter then filed a second amended notice of appeal, which encompassed the court's order of dismissal.

## II.

Initially, we must consider whether there is still a live case or controversy in light of the settlement agreement and the dismissal order. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). To determine whether a case is moot, a court must ask whether a change in the circumstances existing at the beginning of the litigation has "forestalled any occasion for meaningful relief" that the court could grant. *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 n.4 (9th Cir. 2000) (internal citation and quotation marks omitted).

[1] Although the district court's order stated that "[n]othing herein shall affect the appeal by Ford and its counsel," the district court could not create a case or controversy where none existed. In both the district court's order of dismissal and the settlement agreement, Ford agreed, in the event of a successful appeal, not to seek reimbursement from Lasar or his counsel for the monetary sanctions that it had paid to them. Accordingly, there is no longer a live controversy between Ford and Lasar over the sanctions that Ford paid to Lasar. *See Riverhead Sav. Bank v. Nat'l Mortgage Equity Corp.*, 893 F.2d 1109, 1112 (9th Cir. 1990) (holding that settlement mooted an appeal over fees payable directly to a party rather than to the court). Any claim by Ford to reimbursement of the $61,397.50 is therefore moot. And because Ford paid the entire amount of the sanctions due to Lasar for which Ford and Sutter were jointly and severally liable, Sutter has no stake in an appeal arising out of these sanctions. Thus, we

conclude that any challenge raised by Ford or Sutter related to the $61,397.50 in sanctions awarded to Lasar is moot.

Ford retained its right, however, to challenge and seek reimbursement of the $5,496.15 in sanctions that it paid to the clerk of the district court. To the extent that Ford's claim is moot, it is moot only as to the $61,397.50 paid to Lasar; Ford's challenge to the $5,496.15 in compensatory sanctions is still viable. *Id.* ("Because sanctions assessed against counsel or a party and payable to the clerk of court . . . are not subject to revocation by the parties, they are reviewable on appeal regardless of whether the parties settle."). Indeed, the district court's dismissal order recognized that "nothing herein shall preclude Ford from attempting to recover the jury costs paid to the Court in the event the Appellate Court determines that the jury cost sanction was improperly imposed by this Court." Ford therefore has a stake in the outcome of our evaluation of the legality of the monetary sanctions that were made payable to the district court. This issue is not moot.

Finally, we note that the settlement of the underlying case in no way moots Sutter's interest in challenging the district court's contempt citation and the court's revocation of his *pro hac vice* status. Notably, such a "disciplinary action and consequent disqualification may expose [Sutter] to further sanctions by the bar and portends adverse effects upon counsel's careers and public image. . . . The controversy thus remains live and demands consideration." *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1200 n.14 (11th Cir. 1985).

Furthermore, because Sutter was not a party to the settlement, that agreement should not foreclose his right to seek appellate review. *See Johnson v. Bd. of County Comm'rs for Fremont*, 85 F.3d 489, 493 (10th Cir. 1996) (holding that a stipulation by the parties "has no effect on the attorneys' right to appeal because they were not parties to the stipulation"). A contrary result would create conflicting incentives for attorneys. As one of our sister circuits has explained, a "refusal to

grant jurisdiction over an appeal of sanctions after the under-lying suit has been settled thrusts a personal conflict upon the attorney—by settling a case in the client's interest he may have to forfeit a personal right to appeal the sanctions levied against him." *Perkins v. Gen. Motors Corp.*, 965 F.2d 597, 600 (8th Cir. 1992).

**[2]** In sum, we agree with the prevailing view that "settle-ment of an underlying case does not preclude appellate review of an order disqualifying an attorney from further representa-tion insofar as that order rests on grounds that could harm his or her professional reputation." *Johnson*, 85 F.3d at 492. We proceed to the merits of Ford's and Sutter's appeals.

## III.

Ford and Sutter initially argue that the district court vio-lated principles of due process when it imposed monetary sanctions, held Sutter in contempt and revoked Sutter's *pro hac vice* status. Because the decision to impose sanctions under its inherent authority is within the sound discretion of the district court, we will not overturn its decision unless the court committed an error of law or the court's factual determi-nations were clearly erroneous. *Weissman v. Quail Lodge Inc.*, 179 F.3d 1194, 1197-98 (9th Cir. 1999). Under this stan-dard, we review *de novo* issues of law, including whether the district court provided adequate process before imposing sanctions. *Thomas, Head & Greisen Employees Trust v. Buster*, 95 F.3d 1449, 1458 (9th Cir. 1996).

## A.

**[3]** We first consider whether the district court provided Ford and Sutter with adequate procedural due process before imposing sanctions. As this court recently reaffirmed, notice and an opportunity to be heard are indispensable prerequisites for the types of sanctions[5] imposed by the district court. *Cole*

---

[5]The due process requirements for contempt citations and monetary sanctions are similar. *F.J. Hanshaw Enters., Inc. v. Emerald River Dev.,*

*v. United States Dist. Court*, 366 F.3d 813, 821 (9th Cir. 2004) ("for the court to sanction an attorney, procedural due process requires notice and an opportunity to be heard"); *see also Weissman*, 179 F.3d at 1198. In particular, "[i]t is axiomatic that procedural due process requires notice of the grounds for, and possible types of, sanctions." *Cole*, 366 F.3d at 821. Notice and an opportunity to be heard "are essential in view of the heightened potential for abuse posed by the contempt power[,]" and "[t]he provision of [these procedural protections] accords with our historic notions of elementary fairness." *Taylor v. Hayes*, 418 U.S. 488, 500 (1974). These minimal procedural requirements give an attorney an opportunity to argue that his actions were an acceptable means of representing his client, to present mitigating circumstances, or to apologize to the court for his conduct. *See id.* at 499. Thus, Ford and Sutter were entitled to notice and an opportunity to be heard before the district court imposed sanctions.

**[4]** Ford and Sutter claim a right to more than notice and an opportunity to be heard. They argue that they were entitled to the full panoply of procedural protections that are normally reserved for defendants charged with a criminal offense, such as an independent prosecutor, proof beyond a reasonable doubt, and a jury trial. When monetary sanctions or a contempt citation are criminal in nature, these additional protections may be required. *Bagwell*, 512 U.S. at 826. In contrast, civil sanctions may be imposed so long as the court provides adequate notice and an opportunity to be heard. *Id.* at 827.

**[5]** In the context of a sentence of imprisonment for contemptuous conduct, the Supreme Court has long distinguished

*Inc.*, 244 F.3d 1128, 1137 (9th Cir. 2001) ("Although contempt and sanctions are not identical, the principles the Supreme Court articulated for cases of contempt in *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821[ ] (1994), guide our determination of what procedural protections are necessary in imposing sanctions under a court's inherent powers.").

criminal contempts from civil contempts by looking to the "character and purpose" of the sentence. *See Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911). Confinement for contempt is criminal if it is "punitive" and for the purpose of "vindicat[ing] the authority of the court." *Id.* In contrast, contempt is civil if it is "remedial" and "for the benefit of the complainant." *Id.* A civil contemnor "carries the keys of his prison in his own pocket" because civil contempt is "intended to be remedial by coercing the defendant to do what he had refused to do." *Id.* at 442 (internal quotation marks omitted). By contrast, imprisonment for a definite period of time, regardless of the contemnor's future actions, is criminal because the contemnor is "furnished no key." *Id.* As the Supreme Court also has explained, "[t]his dichotomy between coercive and punitive imprisonment has been extended to the fine context." *Bagwell*, 512 U.S. at 829. Thus, "[w]here a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Id.*

**[6]** Although the monetary sanctions imposed by the district court in this case have some attributes of criminal sanctions, they ultimately qualify as civil sanctions that need be preceded only by adequate notice and an opportunity to be heard. It is true that Ford and Sutter did not hold the keys to their cells, for they had no way of avoiding the monetary sanctions, the contempt finding, or the revocation of Sutter's *pro hac vice* status. The monetary sanctions imposed, however, were compensatory in nature because they were designed to compensate Lasar for unnecessary costs and attorney's fees and to reimburse the district court for the jury costs incurred as a result of the mistrial. It is well-established that compensatory fines are civil sanctions in the context of contempt proceedings. *See Bagwell*, 512 U.S. at 829 ("A contempt fine . . . is considered civil and remedial if it . . . 'compensate[s] the complainant for losses sustained.' " (quoting *United States v. Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947))). Indeed, a court's decision to assess costs has "never . . . been considered [a] criminal" sanction. *Id.* at 833.

We recognize that the Supreme Court has tended to classify fines paid to the court as punitive fines, while fines payable to another party are remedial. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632 (1988). We have recognized, however, that while the identity of the party who receives the fine is an important indicator of whether the fine is criminal or civil, this factor is not determinative. *F.J. Hanshaw Enters., Inc.*, 244 F.3d at 1138 n.7. For example, we have held that a fine payable to an opposing party was punitive because it was not designed "to compensate [the opposing party] for any actual or estimated harm." *Bingman v. Ward*, 100 F.3d 653, 656 (9th Cir. 1996).

**[7]** Although we have never had occasion to consider whether a sanction for bad faith conduct,[6] payable to a district court, that was tailored to reimburse the court for its expenses, can qualify as a compensatory civil sanction, the Seventh Circuit's decision in *United States v. Dowell* is instructive. 257 F.3d 694 (7th Cir. 2001). There, the district court had required a lawyer to pay a fine equal to the cost of empaneling a jury that the court sustained when the lawyer failed to appear in court on the first day of trial. *Id.* at 696-97. The Seventh Circuit held that, although the fine was payable to the district court, the fine was a compensatory civil sanction because "it compensates the court and the government for actual losses sustained as a result of [the lawyer's] refusal to appear at trial.

---

[6]In *Zambrano v. City of Tustin*, we held that a district court could not award sanctions payable to the court "to compensate the judicial branch for being badly used by counsel." 885 F.2d 1473, 1475-76 (9th Cir. 1989) (internal quotation marks omitted). The basis for the court's sanctions order was counsel's negligent failure to obtain admission to the bar of the Central District of California. We specifically did not address the question of whether willful conduct would justify a narrowly tailored sanctions award that was intended to reimburse the court for unnecessary expenses. *Id.* at 1478. Here, the compensatory sanctions ordered payable to the district court were based on Sutter's bad faith violation of the in limine alcohol-related order. Thus, *Zambrano* does not foreclose the result we reach today.

[The lawyer's] recalcitrance imposed real loss; impaneling a jury costs money, and the district court tailored its sanction to compensate for these actual costs." *Id.* at 699-700. As the Seventh Circuit explained, the Supreme Court's decision in *Hicks* involved a contempt for "an individual's failure to pay court-ordered child support payments, and the Court did not contemplate a situation where the court to which the fine was ordered to be paid was in effect the injured complainant." *Id.* at 700.

**[8]** We agree with the *Dowell* court's approach. In the instant case, the district court, after finding that Sutter deliberately violated the pretrial in limine orders, carefully limited the sanctions that were payable to the court to an amount "necessary to reimburse . . . the Court" for the costs related to empaneling the jury. *Lasar*, 239 F. Supp. 2d at 1031. Accordingly, this monetary sanction levied against Ford was compensatory and civil in nature, and need only be preceded by notice and an opportunity to be heard.

**[9]** As for the contempt citation and the revocation of Sutter's *pro hac vice* status, neither one resulted in a sentence of imprisonment. Moreover, although the contempt citation provided an alternative basis for the substantial monetary sanctions, those sanctions were compensatory in nature. We can find no precedent that supports Ford and Sutter's position that these types of sanctions, which do not result in fines or imprisonment, can qualify as criminal sanctions that necessitate full-blown criminal trials. *See, e.g., Hicks*, 485 U.S. at 632 (discussing the necessity of criminal procedural protections when the contempt punishment is either punitive imprisonment or punitive fines). To the contrary, we have held that a district court need only provide notice and an opportunity to be heard before revoking an attorney's *pro hac vice* status, and we have specified that the "opportunity to be heard does not require an oral or evidentiary hearing on the issue." *Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000). Indeed, we have held that "[t]he

opportunity to brief the issue fully satisfies due process requirements." *Id.* If due process does not require an evidentiary hearing, it cannot require the greater procedural protections that normally accompany criminal trials.

[10] Our position is consistent with that of the Third Circuit, which has held that "a full scale hearing is not required in every case" in which an attorney's *pro hac vice* status is subject to revocation. *See Johnson v. Trueblood*, 629 F.2d 302, 304 (3d Cir. 1980). Similarly, in finding that the procedures leading up to a criminal "petty contempt" finding failed to satisfy due process requirements, the Supreme Court has instructed that:

> before an attorney is finally adjudicated in contempt and sentenced after trial for conduct during trial, he should have reasonable notice of the specific charges and opportunity to be heard in his own behalf. This is not to say, however, that a full-scale trial is appropriate. Usually, the events have occurred before the judge's own eyes, and a reporter's transcript is available.

*Taylor*, 418 U.S. at 498-99. Here, the district judge witnessed Sutter's opening statement and could refer back to notes of the trial to refresh his memory. Sutter also was afforded an opportunity to explain his conduct before the district court imposed sanctions and ruled on the OSC. So long as the court did not impose serious criminal penalties, due process did not require the district court to conduct a full-blown trial. *See F.J. Hanshaw Enters., Inc.*, 244 F.3d at 1138 (explaining that contempt which occurs in the court's presence can be punished at a later time after providing notice and an opportunity to be heard and that a full criminal jury trial is only required if serious criminal penalties are imposed).[7] Thus, Ford and Sutter

---

[7]We have not established a "precise limit for a 'serious' sanction entitling an individual to a jury trial." *Id.* at 1139 n.10. We have noted, how-

were entitled only to notice and an opportunity to be heard before sanctions were imposed.[8]

### B.

The district court provided notice and an opportunity to be heard before imposing any sanctions. At the conclusion of the hearing on Lasar's motion for a mistrial, the court notified the parties that sanctions were warranted. The court specifically directed Lasar to prepare an affidavit detailing his fees and costs over the previous two weeks and to serve the affidavit on Stephenson and Sutter by the end of the day. The court also stated that it was "going to issue a show cause order for Mr. Sutter to show cause why he should not be held in contempt . . . [and] why he should not have his right to appear here pro hoc [sic] vice withdrawn from the Court and that he be barred from further participation in this case." Later that day, the district court issued the OSC notifying the parties of the potential monetary sanctions, contempt citation, and revocation of Sutter's *pro hac vice* status. Thus, Sutter and Ford had notice that these sanctions could be imposed, and the sanctions hearing provided Sutter and Ford with an opportunity to contest the imposition of sanctions.[9]

---

ever, that the Supreme Court has implied that "$5,000, at least in 1989 dollars, is the cutoff for a serious fine warranting a jury trial." *Id*. (citing *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 544 (1989)). Although the monetary sanction imposed on Ford exceeded this threshold, it was not a criminal sanction because it was compensatory. As explained in the text, compensatory monetary sanctions, as opposed to criminal fines, need only be preceded by notice and an opportunity to be heard.

[8]Lasar contends that Ford and Sutter should be judicially estopped from arguing that the sanctions were criminal because of representations made by Sutter in subsequent *pro hac vice* applications. We do not address this argument because we conclude that the sanctions were not criminal in nature. And because we have no need to examine the papers presented by Lasar to support his assessment, we deny the request that we strike portions of Lasar's brief and award other forms of relief.

[9]After Ford and Sutter received the OSC, they had two days to prepare for the sanctions hearing. They do not contend that this period of time was insufficient to prepare a meaningful response.

Ford and Sutter argue that the notice was inadequate because they were not informed that the court was considering sanctioning Sutter for failing to disclose the *Kaffeman* disciplinary matter on his *pro hac vice* application. Initially, we note that the monetary sanction and the contempt citation were not imposed because of this omission. Even for the revocation of *pro hac vice* status, the omission was only "additional evidence of [Sutter's] dishonesty."

Second, it was Sutter, not the district court, who raised the *Kaffeman* decision. The first mention of the *Kaffeman* case occurred when Sutter, responding to a question from his co-counsel, stated that he had been held "in contempt" by Judge Cleary in the *Kaffeman* case. As the district court explained, the *Kaffeman* decision "was considered as a result of [Sutter's] own testimony." We decline to fault the district court for carefully considering all of Sutter's testimony and for being familiar with the court's *pro hac vice* requirements.

[11] We agree, however, with Sutter that the district court's lifetime ban on Sutter appearing *pro hac vice* in the Missoula Division on behalf of Ford or any other client without giving adequate notice and an opportunity to respond was an abuse of discretion. The district court never notified the parties that it was considering a lifetime ban on Sutter appearing *pro hac vice* in the Missoula Division.[10] Due process required the district court to notify the parties of the types of sanctions that it was contemplating. *See Cole*, 366 F.3d at 821. Accordingly,

---

[10]Because, by definition, *pro hac vice* status is granted on a case-by-case basis, a lifetime ban makes little sense. That is, every time an application is submitted for approval, the court will have the opportunity to review the applicant's suitability to appear *pro hac vice*. We also note an ambiguity in the district court's order prohibiting Sutter from "represent[ing] Ford in this case or any other case in the Missoula Division . . . ." *Lasar*, 239 F. Supp. at 1034. It is unclear whether "represent Ford" modifies "any other case," as well as "in this case," or whether "any other case" includes cases in which Sutter represents a client other than Ford. Because we vacate the lifetime ban, we need not address this issue. '

we reverse the district court's imposition of a lifetime *pro hac vice* ban on Sutter because it violated Sutter's due process right to notice.

## IV.

Ford and Sutter also contend that in revoking Sutter's *pro hac vice* status, the district court did not comply with the procedures for disciplining attorneys established by the Local Rules. *See* Local Rule 8.14. According to Ford and Sutter, the court could not discipline Sutter for omitting information from his *pro hac vice* application without first referring the matter to the Chief Judge of the District to appoint an investigator and independent counsel to prosecute the alleged violation. And revocation could be ordered only upon clear and convincing evidence that Lasar wilfully violated the disclosure requirements.

Ford and Sutter, however, ignore two important provisos in the Local Rules. First, Local Rule 83.14(a) provides that "[n]othing contained in this Rule shall be construed to limit or deny the Court such powers as are necessary to maintain control over proceedings before it, such as contempt power." Second, this rule clarifies that "[n]othing in this section precludes the Court or any judge of the Court from assessing sanctions for violations of local practice and procedure rules or other applicable statutes and rules." Local Rule 83.14(b). Thus, Rule 83.14 preserves the presiding judge's inherent authority to impose sanctions and to hold an attorney in contempt, while providing a procedure for referring disciplinary matters to the Chief Judge if the presiding judge decides such a procedure is appropriate. This comports with the Supreme Court's position that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers v. Nasco, Inc.*, 501 U.S. 32, 49 (1991). Accordingly, the district court did not violate the

Local Rules when it revoked Sutter's *pro hac vice* status without referring the matter to the Chief Judge.[11]

## V.

We next consider whether the district court improperly determined that Sutter violated the orders in limine or that Sutter failed to disclose a prior contempt citation.

## A.

Ford and Sutter argue that the district court erred when it held that Sutter had, during his opening statement, violated the in limine order prohibiting references to alcohol use by Lasar. We disagree.

[12] Sutter, by his own admission, carefully chose to tell the jury that the accident occurred after Lasar "met up with some of his friends and spent the day playing pool, visiting some local establishments" and then "made the decision to drive himself home." As the district court emphasized, "[w]hat this record does not show is the tone and inflection of Mr. Sutter's voice." Even the record, however, suggests a calculated attempt to introduce evidence that Lasar was drinking before the accident. We cannot say that the district judge clearly erred in finding that Sutter's words conveyed the unambiguous message that Lasar had been drinking at a bar (or bars) and then made the dangerous and unlawful decision to drive himself home while intoxicated. Thus, we cannot conclude that the district court abused its discretion when it determined that Sutter violated the order in limine. *See United States v. Avery*, 295 F.3d 1158, 1181 (10th Cir. 2002) (stating

---

[11]In fact, the judge presiding over this case is the Chief Judge of the District of Montana. It is clear from the circumstances, however, that Judge Malloy was acting in his capacity as the judge presiding over the Lasar matter and not in his capacity as the Chief Judge of the district in the sanctions proceeding.

that a district court's ruling on whether an attorney violated an order in limine is reviewed for abuse of discretion).[12] Moreover, in light of Sutter's own statements about the deliberateness with which he crafted his opening statement, the district court did not commit clear error in holding that this was a deliberate bad faith violation.[13] *See Pac. Harbor Capital, Inc.*, 210 F.3d at 1117 ("We will reverse a district court's factual findings as to whether an attorney acted recklessly or in bad faith only if they are clearly erroneous.").

## B.

Ford and Sutter also contend that the district court erred to the extent it relied on the omission of the *Kaffeman* disciplin-

---

[12]Although we have held that a district court's decision whether to issue an in limine order is an evidentiary ruling that we review for abuse of discretion, *United States v. Komisaruk*, 885 F.2d 490, 492 (9th Cir. 1989), we have never considered what standard of review to apply to a district court's determination of whether a party or an attorney has violated an in limine order. We agree with the Tenth Circuit's holding in *Avery* that whether a party has violated an in limine order is also an evidentiary ruling that should be reviewed for abuse of discretion. 295 F.3d at 1181.

[13]Ford's counsel at oral argument challenged the district court's decision to grant a mistrial. As we understand its position, Ford challenges the mistrial ruling only insofar as it resulted in the imposition of monetary sanctions on Ford. Assuming that this issue was properly raised in its opening brief, we nevertheless conclude that the district court did not abuse its discretion in granting Lasar's request for a mistrial. *See United States v. Vincent*, 758 F.2d 379, 380 (9th Cir. 1985) ("A district court's decision on a motion for mistrial is reviewed for abuse of discretion."). A mistrial was appropriate because the in limine order prohibiting references to Lasar's use of alcohol was "specific in its prohibition and the violation [was] clear . . . ." Furthermore, the violation resulted in prejudice to Lasar. *See Pullman v. Land O'Lakes, Inc.*, 262 F.3d 759, 762 (8th Cir. 2001). The district court considered the less drastic alternative of a curative instruction, but concluded that this alternative would have brought only more attention to the matter. *See Zambrano*, 885 F.2d at 1475 n.4 (warning that a district court should consider alternatives to declaring a mistrial); *see also Seltzer v. Chesley*, 512 F.2d 1030, 1035 (9th Cir. 1975) ("curative instructions must not emphasize the error").

ary matter from Sutter's *pro hac vice* application to justify the imposition of sanctions. The Local Rules required Sutter to disclose in his *pro hac vice* application whether he had "ever been held in contempt, [or] otherwise disciplined by any court for disobedience to its rules or orders . . . ." Local Rule 83.3(e)(3)(E). In the *Kaffeman* case, the presiding judge, Judge Patricia A. Cleary, twice incarcerated Sutter for purportedly violating her orders. *In re Disqualification of Cleary*, 723 N.E.2d at 1107. Judge Cleary, however, never journalized the entry of a contempt order, and under Ohio law, an order is not binding and cannot be appealed unless it is journalized. *State ex rel. Grove v. Nadel*, 691 N.E.2d 275, 277 (Ohio 1998); *Reese v. Proppe*, 443 N.E.2d 992, 998 (Ohio Ct. App. 1981).

The significance of Judge Cleary's confinement of Sutter is also complicated by the Ohio Supreme Court's disqualification of Judge Cleary from the *Kaffeman* case and the Ohio Court of Appeals' decision granting Sutter's client a new trial. When the Ohio Supreme Court ruled on Sutter's motion to disqualify Judge Cleary, it stated that:

> Judge Cleary's courtroom demeanor and conduct toward affiants impl[y] a hostile feeling or spirit of ill will such that requires her disqualification . . . . The brief portion of the record cited above shows Judge Cleary referring to attorney Sutter's incarceration as a "time out," denying affiants' seemingly reasonable requests to record objections . . . , and subjectively characterizing testimony . . . . These actions cause me to conclude that Judge Cleary has demonstrated a fixed anticipatory judgment that requires her disqualification to avoid the appearance of impropriety and restore the absolute confidence of the parties in the fairness of these proceedings.

*In re Disqualification of Cleary*, 723 N.E.2d at 1107 (alteration in original) (internal citations and quotation marks omit-

ted). The Ohio Supreme Court's reference to Sutter's "seemingly reasonable requests to record objections" implies disapproval of Judge Cleary's confinement of Sutter. The Ohio Supreme Court, however, did not explicitly overturn Judge Cleary's discipline of Sutter.

The Ohio Court of Appeals also determined that:

> The record in this case is replete with evidence of the lower court's bias against the defendants in this matter, which clearly prevented a fair and impartial proceeding. . . . Thus, the validity of the entire trial, including the decisions made by the trial court on evidentiary issues, has been drawn into question. Because it is impossible to assess the prejudicial effect of the trial judge's conduct on the proceedings, there is simply no way that any review of this matter can render satisfaction that justice was done. Accordingly, we conclude that the lower court abused its discretion in denying the appellants a new trial.

*Kaffeman*, 781 N.E.2d at 1053. Again, there is no express statement overruling Judge Cleary's confinement of Sutter, but the court of appeals did find that the "entire trial . . . ha[d] been drawn into question" by Judge Cleary's bias. In light of Judge Cleary's failure to journalize her disciplinary actions, and the reviewing court's implicit disapproval of Judge Cleary's treatment of Sutter, it is doubtful that Judge Cleary properly found Sutter in contempt of court.

These facts, however, must be considered in the context of Sutter's repeated representations that he had in fact been held in contempt. Sutter "assert[ed] [to the Ohio Supreme Court] that the judge twice found affiant Sutter in contempt." *In re Disqualification of Cleary*, 723 N.E.2d at 1107. Sutter also testified before the district court on both direct and cross-examination that he had been held in contempt of court. Sutter

only began to question the nature and significance of Judge Cleary's disciplinary action after the district court brought the alleged omission from the *pro hac vice* application to Sutter's attention. At that point, Sutter explained, "I have [sic] the copy of the . . . Patty Cleary case faxed to me last night and it says in that opinion that I was held in contempt, and that's the only reason that I said I was held in contempt today. . . . There was no finding of contempt."

Ultimately, the question is whether Sutter failed to disclose that he had "ever been held in contempt, [or] otherwise disciplined by any court for disobedience to its rules or orders . . . ." Local Rule 83.3(e)(3)(E). In light of these events, Sutter could reasonably have believed that he had never been held in contempt because Judge Cleary never journalized a formal contempt citation.[14] Whether he in fact believed this to be the case is questionable given his representations to the Ohio Supreme Court and the district court that he had been held in contempt.

**[13]** But Sutter and Ford seem to ignore that the Local Rules required Sutter to disclose whether he had "otherwise [been] disciplined by any court for disobedience to its rules or orders." Local Rule 83.3(e)(3)(E). We fail to understand how any reasonable attorney could not view being incarcerated by a judge as a disciplinary action. Nor did the subsequent holdings of the Ohio Supreme Court and the Ohio Court of Appeals relieve Sutter of the duty to disclose this matter to the district court. The Local Rule asks if the attorney has "ever been" disciplined, and does not provide an exception for disciplinary orders that are overturned.

---

[14]We decline Ford and Sutter's request to take judicial notice of a Journal Entry by the Court of Common Pleas of Cuyahoga County, Ohio because they are offering the factual findings contained in the order for the purpose of proving the truth of the factual findings contained therein. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2003) ("Factual findings in one case ordinarily are not admissible for their truth in another case through judicial notice.").

**[14]** This approach does not render the Local Rule vague or strike us as unfair. Any "person of ordinary intelligence [would have] a reasonable opportunity to know" that disclosure would be required in these circumstances. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). We fail to see any ambiguity in the Local Rule: any disciplinary matter must be disclosed, and there is no exception for disciplinary orders that have been called into question by an appellate court. Any potential unfairness that could result from having to report such incidents is easily cured by the attorney's ability to explain the circumstances in his *pro hac vice* application. Thus, we conclude that the district court did not abuse its discretion in relying on this omission from Sutter's *pro hac vice* application as added support for the imposition of sanctions.

Additionally, we would not reverse the district court's imposition of monetary sanctions and the contempt finding in this case even if Sutter had not violated the *pro hac vice* admission requirements. The monetary sanctions and the contempt citation were based solely on Sutter's violation of the in limine order. Although the revocation of Sutter's *pro hac vice* status was based in part on Sutter's failure to disclose the *Kaffeman* matter in his application, the district court stated that this only provided additional evidence of Sutter's dishonesty. We conclude that Sutter's violation of the order in limine relating to alcohol could, standing alone, support the district court's decision to revoke Sutter's *pro hac vice* admission.

## VI.

**[15]** Finally, Ford and Sutter argue that the sanctions were overly harsh. In light of the hardship that Sutter's bad-faith violation of the order in limine caused to Lasar, the court, and other litigants, we disagree.

When a district court sanctions an attorney or a party based on its inherent powers, "[a] primary aspect of [its] discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. The district court's decision to require Ford to pay compensatory sanctions to the court was well within the court's discretion, particularly because the payments were carefully tailored to reimburse the court for those costs that were incurred as a result of the mistrial.

**[16]** The contempt citation also was within the court's discretion, for "[t]he power to punish for contempts is inherent in all courts." *Ex parte Robinson*, 86 U.S. 505, 510 (1873). Finally, the district court's revocation of Sutter's *pro hac vice* status falls within "the scope of the inherent power of the federal courts" because "a federal court has the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43. Accordingly, the district court did not abuse its discretion in crafting these sanctions.

## VII.

In sum, we affirm the district court's formal sanctions order including the imposition of monetary sanctions, the contempt finding, and the revocation of Sutter's *pro hac vice* admission. However, we reverse the district court's lifetime ban on Sutter appearing *pro hac vice* in the Missoula Division.

Each party to bear its own costs.

AFFIRMED IN PART, REVERSED IN PART.