**ALLIED PROPERTY AND CASUAL-
TY INSURANCE COMPANY,
Appellant–Defendant,**

**v.**

**Linda GOOD, Appellee–Plaintiff,**

**and**

**Randall Good, Appellee–Third
Party Defendant.**

**No. 85A04–0902–CV–89.**

Court of Appeals of Indiana.

Dec. 31, 2009.

Rehearing Denied March 25, 2010.

---

Charles T. Jennings, Thomas R. Haley III, Jeffrey W. Ferrand, Jennings Taylor Wheeler & Haley, P.C., Carmel, IN, Attorneys for Appellant.

Mark C. Guenin, Emily C. Guenin–Hodson, Wabash, IN, Attorneys for Appellee, Linda Good.

Kevin W. Marshall, Hobart, IN, Attorney for Appellee, Randall Good.

## OPINION

VAIDIK, Judge.

### Case Summary

We conclude that Indiana trial courts possess the inherent power to sanction parties and attorneys for violating orders in limine and causing mistrials. This power is designed to protect the integrity of the judicial system and to secure compliance with the court's rules and orders. In order for a trial court to impose sanctions against a party or attorney, the court must find that the party engaged in egregious misconduct that causes a mistrial. We review a trial court's sanctioning power for an abuse of discretion. Here, the trial court did not abuse its discretion in (1) concluding that Allied Property and Casualty Insurance Company intentionally violated its order in limine when Allied's own employee referenced a party's criminal history and (2) awarding over $26,000 in attorneys' fees and expert witness fees to Plaintiff Linda Good and Third Party Defendant Randall Good and jury costs to the county as compensatory damages. We therefore affirm the trial court.

### Facts and Procedural History[1]

A fire occurred at Linda and Randall Good's home at 474 Jackson Street in Wabash, Indiana, on March 16, 2003. The fire damaged the structure as well as the contents inside. Allied had issued a Homeowners Policy to Linda which provided coverage for the Jackson Street property. Pursuant to the policy, the dwelling was insured up to $329,518, and the per-

---

1. We held oral argument in the Court of Appeals' courtroom at the Statehouse on December 10, 2009. We commend the parties on the quality of their presentations.

sonal property was insured up to $247,138. Randall, as Linda's spouse, was considered an insured under the terms of the policy. Appellant's App. p. 4974.

In March 2004 Linda filed a complaint against Allied in Wabash Circuit Court alleging that it breached the policy by failing to pay proceeds following the fire and that it breached its duty to act in good faith. Allied asserted affirmative defenses, including the common law arson defense, an application fraud defense, a misrepresentation/fraud defense, and other contract defenses based on the insurance policy's intentional act and fraud exclusions. Allied also filed a Counterclaim for Declaratory Judgment requesting the trial court to determine that no coverage existed based on the above grounds and a Third Party Complaint against Randall requesting the trial court to determine that no coverage was afforded to Linda due to Randall's involvement in the intentional setting of the fire.

After years of pretrial motions including several motions for summary judgment, the trial court *sua sponte* issued an oral order bifurcating the trial into Phase I (breach of contract) and Phase II (bad faith). Allied filed a motion to reconsider this ruling, which the court denied. The parties also filed numerous motions in limine. At the October 6, 2008, final pretrial conference, the trial court orally issued orders on some of Linda's motions in limine. Specifically, the court ordered that Randall's criminal history was inadmissible during Phase I of the trial, subject to Indiana Evidence Rule 609.[2] *Id.* at 4262. Randall's criminal history includes at least one theft conviction from approximately thirty years ago. Further, the court ordered that no mention be made of the Goods' prior fires. *Id.* at 4475–76.

The trial began on December 12, 2008, with jury selection. At trial, Allied was represented by attorneys Charles Jennings and Jeffrey Ferrand, Linda was represented by attorneys Mark Guenin and Emily Guenin–Hodson, and Randall was represented by attorney Kevin Marshall.

On the third day of trial, Allied witness Arvin Copeland, a fire investigator, responded to a cross-examination question from Mr. Marshall about previous fires he had investigated. He answered that he had investigated a previous fire at the Goods' home in 2000. Mr. Marshall immediately objected because this was in violation of the trial court's order in limine. In addition, the previous fire at the Goods' home was in 1994, not 2000. The trial court reminded Copeland of the order in limine (of which Mr. Jennings assured the court that Copeland had been informed) and instructed Copeland that he was coming very close to being found in contempt of court. *Id.* at 4749. The trial court then

---

2. Evidence Rule 609 provides:

(a) **General Rule.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime or an attempt of a crime shall be admitted but only if the crime committed or attempted is (1) murder, treason, rape, robbery, kidnapping, burglary, arson, criminal confinement or perjury; or (2) a crime involving dishonesty or false statement.

(b) **Time Limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or, if the conviction resulted in confinement of the witness then the date of the release of the witness from the confinement unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

gave the jury the following curative instruction, "Ladies and gentlemen, you are instructed and admonished that there was no house fire at the home of Randall and Linda Good in the year 2000, and that the issue now under consideration is only the fire which occurred on March 16, 2003." *Id.* at 4761. Allied objected to this instruction and asked for a mistrial, believing that it impugned its witness. The court denied the motion for mistrial.

On the morning of the fourth day of trial, Mr. Guenin expressed concern that scheduled witnesses Cheri Frank or Gregory Keel (Mr. Guenin did not know at that point that Allied's employee Natalie Hornung would be testifying) would testify in violation of the orders in limine by perhaps referencing previous fires or prior convictions. The following colloquy occurred:

THE COURT: Okay, that's obviously the stuff that's in violation of the Motion in Limine, and if Mr. Keel gets up and starts doing that, that's probably the end of the trial and [I] will find everybody in contempt and we'll start over again from the Wabash County Jail.

MR. JENNINGS: Your Honor, we have given each witness who has attended and testified, and before they testified, a letter outlining all of your orders. We do not intend to elicit anything about polygraphs or prior fires . . . .

* * * * * *

THE COURT: But I mean in front of the jury, that's not going to come in and if it's going to be necessary for you to perhaps consult with your witness a little bit more than just the letter that you sent to avoid the problem we had yesterday, that would be a good idea.

MR. JENNINGS: We have consulted with each one before, Your Honor, also. And we will not attempt to elicit anything. We have told them they are not

to, if they are pushed by the other side, they are not supposed to answer unless you tell them they can.

*Id.* at 4914. Then, when it became apparent that Keel was not going to appear for trial, Allied tried to introduce his deposition into evidence. Keel's deposition provided that Randall offered him $3000 to burn down the Jackson Street property. The trial court ruled that Keel's deposition was inadmissible.

Allied's attorneys then called Natalie Hornung as a witness. Hornung testified on direct examination that in 2003 she was a manager for Allied's underwriting department and that she reviewed the application that agent Cheri Frank submitted on behalf of Linda. *Id.* at 47. The following exchange then occurred:

Q: Did you learn as part of the investigation of this claim that there were representations made on that application that were not truthful?

A: Yes, I did.

Q: And would you tell the jury some of those representations that you believe were not truthful based upon what you were told, and the information you acquired?

A: Okay. Some of the representations that I believe were incorrect were regarding the prior cancellations for the Goods *and the prior felony convictions* as well as—

MR. GUENIN: Objection, Your Honor.

* * * * * *

**JURORS TAKEN OUT**

THE COURT: Mr. Jennings, I want you to explain to me why you should not be held in contempt.

MR. JENNINGS: Your Honor, we did review with this witness—as we did with all witnesses—all of the orders in limine including the felony convictions. I just

conferred with Ms. Hornung. She has confirmed that we did talk about that and she forgot the admonition not to talk about any felony convictions of prior fires and related matters. We made that representation to this Court. We have letters that we have provided to all the witnesses, going over each of those and we did nothing to encourage this. We have to cover our application defense and we did not expect the witness to talk about prior felony convictions.

THE COURT: She's an employee of Allied Insurance Company?

MR. JENNINGS: Yes, she is.

*Id.* at 48–50 (emphasis added). At this point, an exasperated Mr. Guenin told the trial court that it had been a "[H]erculean task" preparing the case against Allied. *Id.* at 50. Mr. Guenin said that even before Hornung testified, he reminded Mr. Jennings to go over with his witnesses the orders in limine because he did not want a repeat of what occurred the day before. Mr. Guenin therefore opined that Mr. Jennings was either not doing a good job of advising his witnesses of the orders in limine or sending them letters of the orders in limine to cover it up. Mr. Guenin said that Linda had "$180,000 worth of fees in this case over the last five years" yet Allied was the party "looking for a mistrial and a continuance on it. [Allied's] asked for a mistrial once already in this case for what they did wrong. I can't tell you how upset—I'm not thinking clear enough to actually say to the Court what I think the remedy ought to be." *Id.* at 51.

The trial court continued:

> I think what we need to do—well, I'm going to let Mr. Marshall talk at this point. Then we're going to take a break and let the defendants decide what they want to do.
>
> MR. JENNINGS: Your Honor, may I also have a couple comments about—

from this witness about what she was told—

> THE COURT: You're not—no, no, no, sir. We're not going there.
>
> MR. JENNINGS: Okay. We would like to make a record of what—
>
> THE COURT: *You can make a record later. But we're not going there now.* Mr. Marshall?
>
> MR. MARSHALL: If it was a criminal case, I would ask for a mistrial right off. Yesterday the bell was rung once. And we tried to fix it with that instruction. And we did. But right now, if I'm sitting back there, even ignoring yesterday, I'm going, I've got somebody with a felony and a prior fire. Gee, I wonder what they were charged with? That's my problem. And none of that—
>
> THE COURT: And part of my problem is we can't fix this with an admonition because, in fact, Mr. Good was convicted of a felony 30 some years ago. We're going to take a break.

**RECESS TAKEN**

*Id.* at 51–52 (emphasis added). When the parties returned from recess, the trial court said it was prepared to grant a mistrial. However,

> [i]n the absence of such a request, I'm going to want on the record a specific waiver of the right to a mistrial with the understanding that unless you guys can come up with something better than I can, there's no way that we can adequately admonish the jury to disregard what they've heard. If I order a mistrial, I am prepared to order Mr. Jennings to reimburse counsel for the plaintiff and counsel for the [third party] defendant attorney's fees that I determine for the last four days of trial. Mr. Marshall, I presume you've been staying here since it's quite a bit of a drive. I would also require that you be reim-

bursed for the—your out-of-pocket expenses in connection with staying here. Mr. Jennings would also be required to reimburse Wabash County for the cost of the jury.

*Id.* at 52. At this point, Mr. Guenin informed the court that Linda was "regrettably" moving for a mistrial. *Id.* at 53. Mr. Guenin noted that Allied was now aware of every witness Linda intended to call, her entire trial strategy, every question she was going to ask, and every exhibit she was going to present. Mr. Guenin also pointed out the curious timing of Hornung's violation of the order in limine. That is, Hornung's violation came shortly after the trial court ruled that Keel's damaging deposition was inadmissible and a day after Copeland violated the order in limine. Mr. Guenin also highlighted that he specifically requested on the record that very morning that Mr. Jennings remind his witnesses of the orders in limine. *Id.* Mr. Guenin then asked the trial court for a $200,000 sanction against Allied. *Id.* at 54. Randall's attorney, Mr. Marshall, agreed. *Id.* Mr. Guenin also suggested that Allied's attorney, Mr. Jennings, be removed. Mr. Jennings responded:

> Your Honor, we have represented to this court and swear and I affirm that with every witness we have called, including this witness and every witness before, we have told them on many occasions, in writing and orally, including this witness, not to talk about the prohibited areas. I have done that in writing. This witness flew in this morning—or last night, drove from Indianapolis this morning. We had a ride for her to get here. I did not have the chance to meet with her again this morning because she's leaving; she has twin children home with ear infections and I prevailed upon her to come here. There was no chance I had to meet with her or confer with her, except what we had done be-

fore, and we did go through those things with her. And she did know about these things, and she did apologize, and does apologize for her—what she says was just a simple mistake. She forgot that she wasn't supposed to talk about these things. I don't want to take and point the finger at this witness because she is a lay witness. She may be a professional underwriter at Allied, but witnesses do make mistakes. The Court's admonition yesterday was not about the questions that we posed, but they actually were questions from Mr. Marshall posed to our witness that we called, [Copeland], who was not our company witness, but a representative of Wabash County. He answered the question when we think he was pressured. This witness was not pressured, but this witness simply made a mistake. She has acknowledged that, she has confirmed that, and she is very sorry for what she said. She did not intend to violate any orders, but she's confirmed for me what I already knew, and that is she's been told several times and simply made a mistake.

*Id.* at 54–55. The trial court granted Linda's motion for mistrial. The court found a number of things "deeply troubling." *Id.* at 55. First, the court found that Copeland was, in effect, a professional witness who saw an opening and took it. As for Hornung, the court found that while she might not be a professional witness, she certainly was an employee of Allied who immediately started volunteering information, which was "totally impermissible." *Id.* at 56. The court noted that this followed "directly on the heels" of the evidentiary ruling excluding Keel's deposition, "which obviously did a great deal of damage to [Allied's] case." *Id.* This then led the court to think that there were a couple of possibilities. "Number one, it's possible that your trial strategy was to not have

Mr. Keel here and attempt to use the highly damning deposition, or ... you were unable to subpoena him in sufficient time to have him here. *But it certainly appears to be an intentional harpoon thrown into this proceeding."* *Id.* (emphasis added). The trial court did not require Mr. Jennings' removal but did order that he pay Mr. Guenin's, Ms. Guenin–Hodson's, and Mr. Marshall's fees for the time spent in trial before the mistrial was granted, Mr. Marshall's expenses for residing in Wabash during the pendency of the matter, and their expert witness fees. The court set the attorneys' fees in the amount of $8,000.00 each to be paid within thirty days. *Id.* at 55–56. Notably, the court asked the attorneys if there was "[a]nything else we need to do on the record," and Mr. Jennings said, "No, Your Honor." *Id.* at 57. The court memorialized its oral ruling into a CCS entry. The CCS entry was substantially equivalent to the court's oral ruling, except that it clarified that Allied, and not Mr. Jennings, intentionally violated the order in limine and was obligated to pay for the above fees plus the costs of the jury to Wabash County. *Id.* at 33. The trial was reset for January 2009. *Id.* Linda's attorneys subsequently itemized the following sanctions: attorneys' fees, $24,000; expert witness fees, $1,200; Mr. Marshall's hotel expenses, $268; and jury costs to Wabash County, $2,053.19. *Id.* at 4132. Allied sought an interlocutory appeal as of right from this order pursuant to Indiana Appellate Rule 14(A)(1) (payment of money). Upon Allied's request, these sanctions are stayed pending this appeal.

The new trial proceeded as scheduled in January 2009. Linda was successful in both phases of trial and was also awarded attorneys' fees. In total, Linda recovered $1,052,977.19 from Allied. *Id.* at 4188. Allied is appealing this order under a separate Court of Appeals Cause Number, No. 85A04–0905–CV–240, 2009 WL 4762165. At oral argument, Allied indicated that it intended to appeal the trial court's ruling precluding evidence of prior fires and criminal history from being admitted. Allied sought to consolidate both appeals, but in October 2009 we denied this motion.

## Discussion and Decision

Allied raises one issue in this interlocutory appeal: whether the trial court erred in ordering Allied to pay more than $26,000 in sanctions, including attorneys' fees, expert witness fees, and costs for the jury, when its own employee, Hornung, apparently after having been warned, violated the trial court's order in limine by testifying on direct examination about felony convictions, which resulted in a mistrial. Because this is an interlocutory appeal as of right from the payment of money, Allied does not appeal the trial court's grant of Linda's motion for mistrial.

 We begin with the purpose of an order in limine. A ruling on a motion in limine is not final on the admissibility of evidence and instead is designed to prevent mention of prejudicial material to the jury before the trial court has had the opportunity to consider its admissibility. *Brown v. Terre Haute Reg'l Hosp.,* 537 N.E.2d 54, 59 (Ind.Ct.App.1989). One consequence of this is that the ruling granting or denying a motion in limine is not available as a ground for reversal. *Id.* The second consequence is that error based upon the subsequent admission of evidence must be predicated upon timely and proper objection when the evidence is offered at trial. *Id.* That is not to say that a party who violates an order in limine may do so with impunity. *Id.* The sanction is within the discretion of the trial court and under appropriate circumstances might extend to declaration of a mistrial and/or punishment for contempt. *Id.*

■ As for a mistrial, declaration of a mistrial is generally within the discretion of the trial court. *Tincher v. Davidson*, 762 N.E.2d 1221, 1226 (Ind.2002). It is "an extreme remedy invoked only when no other measure can rectify the perilous situation." *Id.* (quotation omitted). On appeal, we afford great deference to the trial judge's discretion in determining whether to grant a mistrial because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury. *Hull v. Taylor*, 644 N.E.2d 622, 626 (Ind.Ct.App.1994).

In responding to Allied's argument that the trial court erred in imposing more than $26,000 in sanctions against it, neither Linda nor Randall cites any Indiana case in which a trial court has awarded sanctions—including attorney's fees, expert witness fees, or costs for the jury—against a party for violating an order in limine and causing a mistrial. Both Linda and Randall argue that courts "have the inherent power to punish parties in the course of 'maintaining its dignity, securing obedience to its process and rules, rebuking interference with the conduct of business, and punishing unseemly behavior.'" *Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 650 (Ind.Ct.App.2008) (sanctions during the discovery process) (quoting *City of Gary v. Major*, 822 N.E.2d 165, 169 (Ind.2005) (sanctions for indirect contempt)); *see also Noble County v. Rogers*, 745 N.E.2d 194 (Ind.2001) (sanctions for government's wrongful conduct pursuant to Indiana Trial Rule 65(C), despite immunity granted by the Indiana Tort Claims Act).

As Allied points out, the cases Linda and Randall cite on appeal do not stem from the violation of an order in limine and the subsequent granting of a mistrial. Appellant's Reply Br. p. 3–4. Nevertheless, Allied "recognizes and does not dispute a trial court's inherent authority to take appropriate action to control the trial proceedings and, in appropriate circumstances, a trial court's authority to issue reasonable sanctions." Appellant's Br. p. 16. Allied took this same position at the oral argument.

We emphasize that this case is about our trial courts' inherent authority to enforce their own orders and not about their statutory contempt power. Our Supreme Court has recognized on multiple occasions that our courts have inherent authority. *See, e.g., Major*, 822 N.E.2d at 169 ("[A]mong the inherent powers of a court is that of maintaining its dignity, securing obedience to its process and rules, rebuking interference with the conduct of business, and punishing unseemly behavior."). In *Rogers*, our Supreme Court expounded upon a trial court's inherent power to sanction attorneys and parties appearing before it and noted that it is a necessary precondition to the exercise of its independent judicial power:

> To deny a court the power to enforce obedience to its lawful orders against parties who have been subjected properly to its jurisdiction in the first instance, is to nullify its effectiveness as an independent branch of our government. The power of a court to enforce compliance with its orders and decrees duly entered is inherent. No statutory sanction is needed. In both equity and law a court would be powerless to give effective relief were its arms tied by such requirements as relator asserts are necessary. To protect the proper functioning of judicial proceedings, we also have imbedded this power in numerous court rules. *See, e.g.,* Ind. Trial Rule 11, Ind. Trial Rule 37. Similarly, the judicial power encompasses the ability to hold a litigant in contempt. *See, e.g., Meyer v. Wolvos*, 707 N.E.2d 1029, 1031 (Ind.Ct.

App.1999) ("We have recognized the inherent judicial power to deal with contempt. No statutory sanction is needed as a court's power to enforce compliance with its orders and decrees duly entered is inherent."), *transfer denied.* 745 N.E.2d at 198 (citations omitted).

We also have recognized a trial court's inherent authority in *Nichols.* In doing so, we relied on a D.C. Circuit case, *Shepherd v. American Broadcasting Companies, Inc.,* in which the district court entered default judgment against the defendant for its misconduct before trial. The Circuit Court stated on appeal, "As old as the judiciary itself, the inherent power enables courts to protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary, including even dismissals and default judgments." *Shepherd,* 62 F.3d 1469, 1472 (D.C.Cir.1995). The court, however, "cautioned restraint in the use of inherent powers" "because of their very potency." *Id.* at 1475.

From the above cases, it is clear that Indiana trial courts possess inherent power to sanction for discovery violations, contempt, and the government's wrongful conduct pursuant to Trial Rule 65(C). But the question presented in this appeal is whether this inherent power extends to imposing sanctions for violating an order in limine and causing a mistrial. Although it appears that Indiana appellate courts have not addressed this issue head-on, other jurisdictions have.

In the recent Vermont Supreme Court case of *Turner v. Roman Catholic Diocese of Burlington, Vermont,* 987 A.2d 960, 2009 WL 3233764 (Vt. Oct.9, 2009), the trial court imposed monetary sanctions against the Diocese for "repeatedly and deliberately" violating an order in limine and causing a mistrial. *Id.* at 967. The sanctions, which amounted to $112,000, included attorneys' fees and expert witness fees. The trial court characterized defense counsel's actions as "misconduct." *Id.* The Diocese appealed. On appeal, the Vermont Supreme Court first articulated that a mistrial can be an appropriate remedy for violation of an order in limine. *Id.* "Further, the court has inherent power to sanction a party 'to protect the integrity of the judicial system.'" *Id.* Citing to its own law as well as Texas law, the court held that trial courts have inherent power to assess expenses for consequential damages suffered by the opposing side, including attorneys' fees and witness expenses, incurred due to an abuse of the judicial process. *Id.* at 969. "Abuse of the judicial process includes ignoring court orders and acting in bad faith." *Id.* But for the court to take action in response to a pretrial order, the order must be specific. *Id.* Concluding that the trial court's pre-trial order was specific and definite and that the court had no obligation to specifically warn the Diocese that a violation of its order in limine may result in a mistrial and sanctions, the supreme court concluded that the trial court acted within its authority in declaring a mistrial and imposing a compensatory sanction on the Diocese. *Id.* at 971. *See also Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater,* 465 F.3d 642, 646 (6th Cir.2006) ("Furthermore, *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766–67, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), held that federal courts have the inherent power to assess attorney's fees against counsel who willfully abuse judicial processes or who otherwise act in bad faith."); *Lasar v. Ford Motor Co.,* 399 F.3d 1101, 1118 (9th Cir. 2005) ("When a district court sanctions an attorney or a party based on its inherent

powers, a primary aspect of [its] discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. The district court's decision to require Ford to pay compensatory sanctions to the court was well within the court's discretion, particularly because the payments were carefully tailored to reimburse the court for those costs that were incurred as a result of the mistrial.") (quotation omitted); *Walker v. Ferguson,* 102 P.3d 144, 145 (Okla.2004) (holding that an award of sanctions for causing a mistrial under the trial court's inherent authority must reflect a finding of bad faith or oppressive conduct on the part of the sanctioned party); *Terry v. Sweeney,* 10 P.3d 554, 558 (Wyo.2000) (holding that the authority for the trial court's sanctions, which included attorney's fees, against the plaintiffs for violating an order in limine and causing a mistrial "is founded in the inherent authority of all courts to take actions reasonably necessary to administer justice efficiently, fairly, and economically and [to ensure] the court's existence, dignity, and functions") (quotation omitted). *But see Clark v. Optical Coating Lab., Inc.,* 165 Cal.App.4th 150, 80 Cal.Rptr.3d 812, 827, 828–29 (2008) (holding that the trial court's award of attorney fees against plaintiff's counsel for their violation of the order in limine did not fall within the court's inherent powers because "allowing the trial courts to impose attorney fees as sanctions for attorney misconduct without statutory protections would undermine due process and threaten the independence of the bar"), *reh'g denied, review denied.*

In line with the Vermont Supreme Court, the Michigan Court of Appeals aptly stated a decade ago:

This Court has repeatedly recognized that a trial court has inherent authority to impose sanctions on the basis of the misconduct of a party or an attorney. In addition, our Supreme Court has "recognized the inherent power of a court to control the movement of cases on its docket by a variety of sanctions."

. . .

[T]his Court [has] held that a court has the inherent authority to dismiss a lawsuit as a sanction for litigant misconduct. It therefore follows that the less severe sanction of an assessment of attorney fees is within a court's inherent power as well. We conclude that a court's inherent power to sanction misconduct and to control the movement of cases on its docket includes the power to award attorney fees as sanctions when the egregious misconduct of a party or an attorney causes a mistrial. The ability to impose such sanctions serves the dual purposes of deterring flagrant misbehavior, particularly where the offending party may have deliberately provoked a mistrial, and compensating the innocent party for the attorney fees incurred during the mistrial.

*Persichini v. William Beaumont Hosp.,* 238 Mich.App. 626, 607 N.W.2d 100, 108–09 (1999) (citations omitted) (footnote omitted).

■ Based upon our Supreme Court's opinion in *Rogers,* which holds that the power of a court to enforce compliance with its orders duly entered is inherent and no statutory sanction is needed, and given the other jurisdictions' sound reasoning for sanctioning parties and attorneys for violating orders in limine and causing mistrials, we conclude that Indiana trial courts possess the inherent power to sanction parties and attorneys for violating orders in limine and causing mistrials. This power is designed to protect the integrity of the judicial system and to secure compliance with the court's rules and orders. We review a trial court's sanctioning power for an abuse of discretion.

■ The trial court has the power to impose sanctions against a party or attorney who engages in egregious misconduct that causes a mistrial. Egregious misconduct consists of intentional, reckless, or negligent conduct by the party or attorney. In addition, the court has the power to impose sanctions for violation of an order that the party or attorney believes to be (or turns out to be) erroneous. Therefore, if the party or attorney believes that the court's order is erroneous, then the proper remedy is to appeal that order and not violate it, thereby risking a mistrial and sanctions. Sanctions may include compensating the innocent parties for attorney's fees and other expenses incurred during the mistrial. To hold otherwise would work an injustice against the innocent party.

■ Before a trial court can impose sanctions against a party or attorney, the party or attorney is entitled to due process, which includes notice and the opportunity to be heard. *See Lasar*, 399 F.3d at 1109–10. These minimal procedural requirements give the party or attorney an opportunity to argue that its actions were acceptable, present mitigating circumstances, or apologize to the court for its conduct. *See id.* at 1110. Because these sanctions are compensatory in nature and are distinguishable from criminal contempt, a full-scale oral or evidentiary hearing is not required. This is particularly so because, "[u]sually, the events have occurred before the judge's own eyes, and a reporter's transcript is available" if needed. *Id.* at 1112 (quotation omitted).

■ On appeal, Allied does not argue it was justified in violating the order in limine as the order, in its opinion, was erroneous. Rather, Allied properly indicated at the oral argument that it was appealing the trial court's ruling precluding evidence of prior fires and criminal history from

being admitted. Allied, however, argues that it was not afforded procedural due process because the trial court did not allow it to present Hornung's testimony concerning why she testified in violation of the order in limine and because the evidence does not show that it intentionally violated the order. We first address Allied's argument that it was not afforded due process.

Allied asserts that before the trial court could find that it violated the order in limine, the court should have questioned Hornung under oath. We first point out that the trial court imposed the sanctions against Allied and not Hornung. Allied's attorney, Mr. Jennings, spoke at length regarding Hornung's knowledge of the order in limine. Mr. Jennings told the court that he advised Hornung "on many occasions, in writing and orally, . . . not to talk about the prohibited areas." Appellant's App. p. 54. Mr. Jennings said that Hornung knew about "these things," apologized for her testimony, said it was just a simple mistake, and forgot that she was not supposed to talk about "these things." *Id.* at 55. Thus, although Hornung did not testify, Mr. Jennings was able to relay to the court what Hornung would have said. Furthermore, although the trial court told Allied that it could make a record of Hornung's testimony later, Allied did not later ask to do so. In fact, when the trial court asked the parties if there was anything else they needed to do on the record, Allied said no. The trial court afforded Allied notice and the opportunity to be heard.

■ Allied next argues that the evidence does not show that it intentionally violated the order in limine. The trial court found "that Defendant Allied has *intentionally* violated the Court's Order in Limine." Appellant's App. p. 33 (emphasis added). The court also found that giv-

en the ruling excluding Keel's deposition, Allied's trial strategy was to throw "an *intentional* harpoon . . . into this proceeding." *Id.* at 56 (emphasis added). Notwithstanding these findings, it is Allied's position that Hornung "*accidently* violated an Order in Limine even though she had been informed orally and in writing of the prohibited areas of discussion for Phase I, including Randall Good's felony history." Appellant's Br. p. 20.

However, the trial court, and not this Court, is in the best position to gauge Allied's motives given that the court not only observed the violation first hand but also the attorneys' remarks. Just before Hornung testified there was a discussion on the record about the importance of Allied advising its witnesses of the orders in limine because of the violation that had occurred the day before with Allied's witness, Copeland. Nevertheless, Hornung violated the court's order a few answers into her testimony with a question posed by her own employer's attorney, Mr. Jennings. This violation occurred shortly after the trial court had ruled that Allied would not be able to introduce into evidence Keel's damaging deposition, which provided that Randall had offered him $3000 to burn down the Jackson Street property. From this evidence, the trial court could have reasonably inferred that Allied intentionally violated the order in limine. Because the trial court determined that Allied intentionally violated the order and such violation required a mistrial, the evidence supports the conclusion that Allied's conduct was egregious and caused a mistrial. Furthermore, the sanctions imposed by the court against Allied were compensatory in nature to reimburse the Goods, their attorneys, and the county

for costs incurred as a direct result of Allied's violation of the order in limine. The trial court did not abuse its discretion in sanctioning Allied.

■ As a final matter, Randall asks us to award appellate attorneys' fees to Linda's and Randall's attorneys pursuant to Indiana Appellate Rule 66(E) for procedural bad faith in this appeal. Randall's Br. p. 16. Appellate Rule 66(E) provides, "The Court may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees. The Court shall remand the case for execution." Randall points out that Allied compiled a 22-volume, 5116-page appendix, which includes a duplicate of the transcript as well as several other documents, for an appeal involving a single issue. In addition, Randall points out that Allied's brief has multiple citations to documents that were never part of the trial record. While we do acknowledge the enormity of the appendix in this case, most of which was not needed to resolve the issue on appeal, because this appeal involves an issue of first impression and is not frivolous or in bad faith, we decline Randall's request to award appellate attorneys' fees.

Affirmed.

DARDEN, J., and BRADFORD, J., concur.